## Alexander Findlay, Plaintiff in Error, v. Corn Exchange National Bank, Defendant in Error.

## Gen. No. 15,821.

1. PRESUMPTIONS—*as to receipt of checks.* If checks are placed in envelopes and properly addressed and mailed to the payee the presumption arises that they were received by such payee in the regular course of business.

2. NEGOTIABLE INSTRUMENTS—*effect of delivery of checks.* Delivery of a check to the payee thereof constitutes an assignment *pro tanto* of the funds of the drawee in the bank and vests a right of action thereon in the payee, and the maker thereupon loses control over the check and the funds represented thereby.

3. NEGOTIABLE INSTRUMENTS—*in whom right of action vests on payment of check upon forged endorsement.* If the bank pay a check upon a forged endorsement, the right of action to recover the fund thus diverted is vested in the payee of the check.

4. NEGOTIABLE INSTRUMENTS—*duty of depositor to notify bank of forgery.* It is the duty of a depositor to notify the bank immediately

upon his discovery of a forgery and a depositor who fails to notify his bank of a forged endorsement as soon as it is discovered, loses all right of action against the bank.

Error to the Municipal Court of Chicago; the Hon. ARNOLD HEAP, Judge, presiding.    Heard in the Branch Appellate Court at the October term, 1909.    Affirmed.    Opinion filed November 14, 1911.

HOYNE, O'CONNOR, HOYNE & IRWIN, for plaintiff in error; HARRY D. IRWIN and CARL J. APPELL, of counsel.

JACOB E. DITTUS, for defendant in error.

MR. JUSTICE SMITH delivered the opinion of the court.

An action was commenced in the Municipal Court of Chicago on April 10, 1909, as a fourth class case. The amended statement of plaintiff's claim, filed in the action, alleges that two checks had been wrongfully charged to plaintiff's account, and that the amounts thereof still remained to his credit, for which he brought suit.

The substance of the defenses set up by the amended affidavit of merits filed by the defendant, may be briefly stated thus:

First, that the right of action, if any, growing out of the subject-matter of the suit belongs to Samuel Cabot, a corporation, the payee of the checks, and not to A. Findlay, the maker.

Second, that the plaintiff has forfeited any possible right of action which he may have had, by his negligence in discovering the forgeries, and his subsequent delay in notifying the defendant of the forgeries after the plaintiff discovered the same.

The plaintiff in error, Findlay, was a depositor of the Corn Exchange National Bank during 1907 and up to November 5th of that year, when his account with the bank was closed. In March, 1907, Findlay mailed to Samuel Cabot, a corporation, at No. 28 Dearborn avenue, Chicago, Illinois, a check in the amount of

$100.65, and on May 19, 1907, a further check for $40.80 in payment for certain goods purchased by him from Cabot. These checks, both of which were drawn on the Corn Exchange National Bank, came into the possession, as later explained, of one E. S. Schenkenberger, who forged the endorsement of the payee thereon, and then endorsed them over to the Chicago Savings Bank and Trust Company, which sent them to the Continental National Bank of Chicago for collection. The Corn Exchange National Bank paid them through the Clearing House to the Continental National Bank and charged the checks up to plaintiff's account returning the cancelled or paid checks to plaintiff as vouchers, together with a statement of his account on the second of the month following their respective dates.

The plaintiff, Findlay, testified that the checks were placed in envelopes properly addressed and mailed by him to Cabot. It appears that the checks were received at the office of Samuel Cabot, the payee, by Morris Potthoff, the bookkeeper of Cabot, or by George H. Bell, Jr., who was employed in Cabot's office as a clerk; and the checks were either taken by Schenkenberger from Cabot's office or turned over to him by Potthoff or Bell, Jr. Both Bell, Jr., and Potthoff, the bookkeeper, were authorized to receive and open mail for Samuel Cabot.

George H. Bell, Jr., was shortly after the time of the mailing of these checks indicted for forging endorsements on checks similar to the ones here involved, in Cabot's office, but escaped before he was arrested and is now a fugitive from justice.

The first knowledge Findlay had of the forgery was obtained by him in the middle of March, 1908, when he received from Cabot a statement for the items paid by the checks in question. Findlay thereupon called George H. Bell, Cabot's manager, on the telephone and

told him that he had paid the account contained in the statement received, and that he had the cancelled checks as evidence of such payment. Bell wrote Findlay a letter requesting him to send the cancelled checks to Bell, which plaintiff did about a month later. Findlay states that he compared the endorsement Samuel Cabot on the checks in question with the endorsements on other checks sent by him to this same corporation, and found the endorsements to be dissimilar, and that he then knew something was the matter. This comparison was undoubtedly made prior to the time the checks were sent to Bell, as Findlay testifies that he never had the checks in his possession after mailing them to Bell in March, 1908.

No notice of the forgery was given to the defendant in error by Findlay or any one representing him, and no demand was made by Findlay or in his interest, until on or about March 26, 1909, or a little over a year after Findlay discovered that the endorsements in question were forged.

George H. Bell, representing Samuel Cabot, the payee named in the checks in question, received the cancelled checks from Findlay in April, 1908, and at once discovered that the endorsements of Samuel Cabot were forged thereon by one E. S. Schenkenberger, whom Bell knew intimately and who was employed by a corporation of which Bell was treasurer. Bell states in his evidence that it was at least two weeks after he made this discovery of the forgeries before he disclosed that fact. He took time to think it over and consult an attorney he says. At the expiration of two weeks or more after discovering the forgeries, Bell went to the Chicago Savings Bank and Trust Company, which had paid the checks to Schenkenberger, and without presenting the checks, stated that he was the representative of Samuel Cabot, and that Schenkenberger had forged Cabot's endorsements on several

Findlay v. Corn Ex. Nat'l B'k, 166 Ill. App. 57.

checks and that the Chicago Savings Bank and Trust Company had paid Schenkenberger the amounts thereof on such forged endorsements. Bell was told that he might consult with the Bank's attorney, William E. O'Neill, which he did on the same day.

The conversation of Bell with Mr. O'Neill, as related by the latter in his testimony, was to the following effect: Bell came to O'Neill's office in the latter part of April or the first part of May, 1908, and they had a conversation relative to certain checks which had passed through the Chicago Savings Bank and Trust Company for collection, which Bell claimed were forged by Schenkenberger. Bell stated that Schenkenberger had access to the mail of Samuel Cabot, whose office he, Schenkenberger, occupied at will, and that Schenkenberger had forged certain checks which were put through the Chicago Savings Bank and Trust Company. No checks were produced by Bell at that conversation. Bell also stated that Schenkenberger had misled Bell's son, who had been in the employ of Cabot, and that both Schenkenberger and Bell's son had left the city, and he thought they were together. Bell further stated that he wanted to protect his son and separate him from Schenkenberger, if possible. Bell was then advised by Mr. O'Neill that he did not consider that the Chicago Savings Bank and Trust Company was liable for the forgeries, but he stated he thought it Bell's duty to pay the amount thereof, to which Bell replied that they were larger in amount than he could afford to take care of, but that he wanted to protect his son, if possible. Subsequently Bell settled with Samuel Cabot for the forgeries, and took an assignment of its claim on the forged checks, and in March or April, 1909, he stated to Mr. O'Neill that he was going to pursue his remedy on those checks as he understood it to be.

The first notice of the forgeries received by the Corn

Exchange National Bank was given to it by George H. Bell, Cabot's representative, about two weeks after the checks were returned by Findlay to Bell. At that time, Bell saw Mr. Gary of the Corn Exchange National Bank, and advised him that the endorsements on the checks were forgeries, and that he represented Samuel Cabot, the payee, and that he wanted to get the money on the checks. According to Bell's story, he stated to Gary, "I could not ask Findlay to pay my account over again, he tried to do so once." Mr. Gary told Bell that before anything could be done Bell would have to get affidavits of the forgeries. Gary's recollection is not clear as to what Bell replied, but he stated that Bell gave some reason why affidavits could not be obtained. Mr. Gary then went with Bell to the Continental National Bank, to which the checks were paid through the Clearing House, and advised them that the endorsements on the checks were claimed by the payee to be forgeries, and demanded that the amount of the checks be paid. The Continental National Bank declined to pay the checks on the ground that no proof of forgery had been furnished, stating that the Clearing House rules did not apply, and said, "We must have some proof first."

After the Continental National Bank had declined to pay the checks to the payee without proof of the alleged forgeries, the Corn Exchange National Bank also declined payment and advised Bell to bring suit if he desired to press his claim any further. Bell thereupon stated that he would consult with his lawyer and adopt whatever legal course was necessary to obtain the payment of the checks.

The conversation with the representative of the Corn Exchange National Bank occurred about the first part of May, 1908, and nothing further was heard about the alleged forgeries, from Bell or any one else, until about March 26, 1909, nearly a year later, when Bell's

objections to producing affidavits of the forgeries seem to have been removed. At any rate, on or about that date, Bell produced an affidavit which stated in substance that the endorsements of the checks in question had been forged by Schenkenberger. Bell further stated that he now demanded payment of the checks in behalf of the maker Findlay instead of the payee, Cabot, as he had stated in the month of May preceding.

The affidavits produced by Bell were submitted in turn to both the Continental National Bank and the Chicago Savings Bank and Trust Company, who were endorsers, both of which declined payment. The Corn Exchange National Bank thereupon declined payment also, and advised Bell that suit would have to be brought to determine its liability if Findlay cared to press his claim further.

It is urged by the plaintiff in error, first, that the plaintiff was not guilty of any unnecessary delay in giving notice of the forgery, but even if he had been the defendant was not injured thereby; second, that the plaintiff was not guilty of any negligence in failing to discover the forgery; and third, that the burden of proof was upon the defendant to show that it had been injured by the negligence of the plaintiff if there had been such negligence.

On the other hand, it is contended by the defendant in error, first, that the right of action against the defendant on account of the wrongful payment of the checks in question belongs to Samuel Cabot, the payee, and not to Findlay, the maker of the checks, and second, that by his unreasonable delay in notifying the defendant bank of the forgeries after he discovered the same the plaintiff has lost whatever right of action he may have had on account of the payment of the checks on forged endorsements.

In our view of the case, the contentions of the plain-

tiff in error are not supported by the law of this state, and we think that the contentions of the defendant in error are well founded.

By the undisputed testimony of the plaintiff the checks in question were placed in envelopes and properly addressed and mailed to the payee. This fact creates the presumption that they were received by the payee in the regular course of business. Young v. Clapp, 147 Ill. 176-190; Dick v. Zimmerman, 207 Ill. 636.

In Wigmore on Evidence, section 95, the learned author says:

"The fixed methods and systematic operation of the government's postal service have been long conceded to be evidence of the due delivery to the addressees of mail matter placed for that purpose in the custody of the authorities."

To the same effect is 16 Cyc., pages 1065, 1066, 1067.

The delivery of a check to the payee thereof constitutes an assignment *pro tanto* of the funds of the drawer in the bank, and vests a right of action thereon in the payee, and the maker thereupon loses control over the check and the funds represented thereby. Gage Hotel Company v. Union National Bank, 171 Ill. 531; Union National Bank v. Oceana County Bank, 80 Ill. 212; Bank of Antigo v. Union Trust Company, 149 Ill. 343, 352.

In Gage Hotel Company v. Union National Bank, *supra,* the court said:

"The relation of the banker to the check holder has been frequently considered by this court, and the right of the check-holder to payment on presentation of the check, provided there are sufficient funds on deposit to meet it, has been recognized and upheld in every case. This court has constantly held that when the check of a depositor is presented to the banker if the deposit is sufficient to pay the check it is an abso-

lute appropriation of the amount of the check to the holder, and that the contract implied by law between the banker and his depositor for the benefit of whoever may become the holder of the check, is one upon which such holder can maintain an action.''

It follows from what we have said above that the right of action against the defendant, the Corn Exchange National Bank, if any, on the check or the funds represented by the checks, is vested in the payee of the checks, and the maker Findlay has no right of action against the defendant either on the checks or for the balance of his account represented by the checks.

In First National Bank v. Pease, 168 Ill. 40, the court, in discussing this question, said: .

''The material question in this case is, whether the drawer of a bill or check may recover the amount named therein from a bank on which such bill or check is drawn where the bank has paid the same on a forged endorsement of the name of the payee. If the check becomes the property of the payee by coming to his hands the liability of the bank would be to such payee for a wrongful payment to another.''

In 2d Daniel's Negotiable Instruments, 5th Edition, section 1663, the author says:

''There is no doubt that if a bank pays a check upon the forged endorsement of the payee's or special endorsee's name, the payee or such endorsee may recover back the amount if the check had been delivered to him.''

In 2d Morse on Banks and Banking, 4th Edition, section 474, the author says:

''If A draws a check payable to B and delivers it to B, and C forges B's name and gets the money, B can recover from the bank on the money counts if the amount has been charged to the drawer. That constitutes an acceptance of the check, and the bank holds

the money for the true owner. If it pay to a wrongful holder or any one not entitled to receive, it must repay. When a check is paid on a forged endorsement the payee may bring suit on it as though there had been no endorsement or payment; or if it had not been issued by the drawer, he can recover the amount from the bank.''

If Findlay ever had any right of action against the defendant Bank he lost that right of action by his unreasonable delay in notifying the bank of the forgeries after he discovered the same.

Findlay testifies that he never authorized Bell to represent him in the matter involved in the action until on or about the first day of April, 1909, about a year after the forgeries were discovered. He further testifies that although he discovered the forgeries in the middle of March, 1908, he did not send the checks to Bell until almost a month later. It is perfectly apparent that Findlay did not interest himself in the situation until long after the forgeries were discovered by him. At Bell's request he mailed the checks to Cabot's office sometime in April, 1908, along with two other checks not involved in this suit. The two latter checks were returned to Findlay in June, 1908, with the advice that they were all right. The two checks involved in this suit were never returned to Findlay at all. Bell retained them in his possession from the time that they were mailed to him, until the suit was commenced. Bell representing the payee of the checks assumed the entire responsibility of the situation and apparently recognized that Findlay had no claim against the bank but that the payee was the owner of the checks, and he sought to collect on behalf of the payee.

The authorities are all agreed that in a case of this kind it is the duty of the depositor to notify the bank immediately upon his discovery of the forgery. There is some controversy in the authorities as to what re-

sults shall follow the breach by the depositor of his duty in this respect. We think the trend of the Illinois cases is, that the depositor who fails to notify his bank of the forgeries as soon as they are discovered loses all right of action against the bank. It is the depositor's duty to discover the forgery, and upon its discovery to promptly notify the bank.

The leading case on this question is Leather Manufacturers' Bank v. Morgan, 117 U. S. 96. That was an action by a depositor to recover a balance of his account with his bank claimed to be due him by reason of the bank having charged to his account certain checks which had been forged by a clerk in the depositor's employ. There was evidence tending to show that the depositor was guilty of neglect in discovering and notifying the bank of the forgery, but there was no evidence in the case tending to show an affirmative loss on the part of the bank. In that case a judgment was entered for the plaintiff below, and in reversing the judgment the Supreme Court say:

"If the depositor was guilty of negligence in not discovering and giving notice of the fraud of his clerk, then the bank was thereby prejudiced, because it was prevented from taking steps, by the arrest of the criminal, or by an attachment of his property, or other form of proceeding, to compel restitution. It is not necessary that it should be made to appear, by evidence, that benefit would certainly have accrued to the bank from an attempt to secure payment from the criminal. Whether the depositor is to be held as having ratified what his clerk did, or to have adopted the checks paid by the bank and charged to him, cannot be made, in this action, to depend upon a calculation whether the criminal had at the time the forgeries were committed, or subsequently, property sufficient to meet the demands of the bank. An inquiry as to the damages in money actually sustained by the bank

by reason of the neglect of the depositor to give
notice of the forgeries might be proper if this were
an action by it to recover damages for a violation of
his duty. But it is a suit by the depositor in effect to
falsify a stated account, to the injury of· the bank,.
whose defense is that the depositor has, by his con-
duct, ratified or adopted the payment of the altered
checks, and thereby induced it to forbear taking steps
for its protection against the person committing the
forgeries. As the right to seek and compel restora-
tion and payment from the person committing the for-
geries was, in itself, a valuable one, it is sufficient if
it appears that the bank, by reason of the negligence of
the depositor, was prevented from promptly, and, it
may be, effectively exercising it.''

The judgment of the Municipal Court is affirmed.

*Affirmed.*