Richard K. Magid, Appellee, v. Drexel National Bank, Appellant.
Richard K. Magid, Appellee, v. National Bank of Hyde Park, Appellant.

Gen. No. 43,651.

Opinion filed February 20, 1947. Opinion modified and rehearing denied March 12, 1947. Released for publication March 28, 1947.

BURKE, JAMES & BURKE and FRANK L. PAUL, all of Chicago, for appellants; EDMUND W. BURKE, FRANK L. PAUL and HARRY N. OSGOOD, all of Chicago, of counsel.

MYER N. ROSENGARD, of Chicago, for appellee.

MR. JUSTICE FRIEND delivered the opinion of the court.

Plaintiff, as payee, brought separate suits in assumpsit, one against Drexel National Bank upon a check drawn by Harry S. Feldman in the sum of $5,000, and the other against the National Bank of Hyde Park upon a check drawn by Morris Kaplan in the sum of $3,200. He alleged that his indorsement as payee on these checks was forged and that he did not receive any money from the proceeds thereof. The checks were presented for payment to the defendant banks by the First National Bank of Chicago, which indorsed them and guaranteed prior indorsements. The two causes were consolidated for trial, and pursuant to a hearing by the court without a jury, separate judgment orders were entered against each of the banks, whose appeals were here consolidated by order entered April 3, 1946.

As the principal ground for reversal it is urged that the delay in notifying the defendant drawee banks of the fact of the alleged forged indorsements precludes

plaintiff from recovery. There is no substantial dispute as to the salient facts, but a recital thereof is essential to an understanding of the issues involved. It appears that plaintiff, a registered pharmacist, was employed by Morris Kaplan, the owner of a drug store in Chicago. During the latter part of December 1943 he went to the Brown Derby Theatre Cafe for the purpose of meeting his wife, who was employed there. While waiting for her, he was accosted by Sam Rinella and asked if his employer, Morris Kaplan, was desirous of purchasing some Golden Wedding whiskey at $48 per case. He thereupon contacted Kaplan, who said he would take 100 cases. Subsequently Kaplan called Harry Feldman, who conducted a tavern and liquor store at 3701 Cottage Grove avenue and for whom he had done considerable buying, and asked him if he also wanted to purchase 100 cases of this whiskey. When he indicated that he would, Kaplan instructed plaintiff to again contact Rinella to advise him that Feldman and Kaplan together would take 200 cases at $48 per case. Several days later Rinella told plaintiff that in order to procure the whiskey he would have to have the money. Plaintiff communicated this message to Kaplan, who told him to ascertain from Feldman whether he was ready to put the money in escrow. Plaintiff thereupon picked up a check from Feldman for $5,000 payable to himself, and the following day received two checks from Kaplan, also made payable to plaintiff, one for $3,200 and one for $1,400 (which is not involved in this transaction), making a total of $9,600, the purchase price of the 200 cases of whiskey. The evening of January 4 plaintiff took Feldman's check to the Brown Derby Theatre Cafe, and in the absence of Sam Rinella delivered it to his wife Peggy, and the following evening he delivered Kaplan's checks. Kaplan testified that plaintiff was to meet Rinella at ten o'clock the next morning; that the checks were not to be delivered to Rinella until Kaplan

and Feldman had received the whiskey, but were to be deposited in the City National Bank of Chicago in escrow. The $3,200 check of Kaplan which is involved in this transaction, was erroneously dated "1943" instead of "1944", and as a consequence it could not be certified. Accordingly it was returned to Kaplan by Peter Elston, an employee of the Brown Derby Theatre Cafe, and Kaplan drew a new check and then went with Elston to the National Bank of Hyde Park to have it certified. Neither of the checks involved in these proceedings was ever placed in escrow with the City National Bank of Chicago or with anyone else.

On the morning of January 6, 1944 plaintiff went to the Brown Derby, and after waiting for Rinella for three hours, went to the drug store, where he was required to report for work at 1:00 p. m., and told Kaplan what had happened. He stated that Kaplan became rather "profane" and "laced into" him for not putting the checks in escrow.

Delivery of the whiskey was supposed to be made early in January 1944, and from that time until the end of April, Kaplan repeatedly called Rinella to ascertain why the whiskey had not been delivered. About April 27 or 28 Kaplan and Feldman went to see Rinella and demanded their whiskey. Rinella told them he could not make delivery and agreed to refund the money by June 5. In this conversation Feldman bluntly told Rinella he thought that there was something "crooked" about the whole deal and that he and Kaplan were being swindled. On June 5 Feldman telephoned Rinella, who asked for and received an extension of 10 days. Thereafter on June 15 Kaplan called Rinella's office and told the girl who answered the phone that if Rinella did not get the money to him and Feldman that day he would take legal action. The following day Kaplan called at the state's attorney's office on behalf of himself and Feldman, and

there told the whole story to Mr. Viterna, an assistant, who on July 3 had Rinella come to the state's attorney's office. Present at that conversation were plaintiff Magid, Kaplan and Rinella, as well as the attorneys for the latter two; only Feldman was absent. As a result of the conversation Rinella promised to have the $9,600 by August 16. He was later given a further extension. On August 26 Feldman signed a complaint against Rinella, charging him with having unlawfully and feloniously obtained $5,000 from him by use and means of the confidence game, and Kaplan executed a similar complaint covering his loss. The charge of forgery was not lodged against anyone at that time.

It appears from the evidence that both Kaplan and Feldman knew that their respective checks had been cashed shortly after they were issued, and that the money or checks had not been put in escrow, as had been agreed. Feldman testified that he began to be worried about his money a week after he executed the check early in January 1944. He then called Kaplan to ask "What about our whiskey?" About March 4, some six or seven weeks later, he again called Kaplan and said "Look, I want to see this Rinella and I want to know first hand right from him what happened to my $5,000.00 and what is happening to the whiskey." Kaplan testified that he knew whiskey was scarce, that he considered Rinella's reasons for not delivering it as "rational," and that he was not especially concerned for approximately two months after his check was drawn because "we wanted the whiskey." Kaplan admitted that he knew plaintiff's signature, and when he first saw his canceled check on April 16 he knew the indorsement was not Magid's signature. The record discloses that Feldman gave his canceled check for $5,000 to Kaplan early in June so that the latter might have it when he called at the state's attorney's office, Feldman being unable to go himself. There is

also the circumstance that plaintiff worked in Kaplan's store at the time of these transactions and continued to do so for approximately eight months thereafter, until August or September 1944, but he stated that during that time he had no conversations with Kaplan and Feldman about the checks. Kaplan, Feldman and Magid all testified that the checks represented money which belonged to Kaplan and Feldman; that plaintiff had no interest therein; and that despite all of Kaplan's and Feldman's conversations with Rinella subsequent to the early part of January, when the whiskey was supposed to be delivered, they never received it or the money from Rinella, although he had repeatedly promised them one or the other.

It appears from the pleadings and evidence that Drexel National Bank first received notice of the alleged forgery about August 31, 1944. Feldman testified in substance that after he discovered the forged indorsement he went to the Drexel National Bank, where he talked to one of the vice presidents and told him about the matter, and there signed a form which was prepared for him, and left it and the check with the vice president.

Although defendants do not concede that the payee's indorsements on the two checks were forgeries, the evidence admits of no other conclusion, and plaintiff argues that if the banks paid the checks on forged indorsements, their liability was absolute unless relieved by par. 43 of the Negotiable Instrument Act (Ill. Rev. Stat. 1945, ch. 98 [Jones Ill. Stats. Ann. 89.043]), which provides that no rights can be acquired under or through a forged signature unless the party against whom it is sought to enforce the rights is "precluded" from setting up the forgery. The facts hereinbefore set forth indicate that these suits involve nothing more than a transaction between Feldman and Kaplan on the one hand, and Rinella on the other, and that proceedings were not instituted until months

after fruitless endeavor on the part of Feldman and Kaplan failed to result in the delivery of the whiskey, or in lieu of that, in the return of their money. It is difficult to believe that after all those months Kaplan and Feldman did not have full knowledge of the facts with respect to the checks drawn by them. Their conduct undoubtedly constituted a ratification or adoption of the departure from the escrow plan, the cashing of the checks, and the retention of the money by Rinella. All this appears from their own testimony. Ratification need not be expressly made; acquiescence thereof may be inferred from the conduct of the parties. *American Car & Foundry Co. v. Industrial Commission*, 335 Ill. 322.

However, the real plaintiffs, Kaplan and Feldman, argue that they cannot be held to have ratified that of which they had no knowledge, and that they did not know of the forgeries for the first few months during which they were negotiating with Rinella for the delivery of the whiskey. But since plaintiff was admittedly their agent his knowledge must be imputed to them, and indeed it is inconceivable that plaintiff, who was closely associated with Kaplan, did not, during these many months, advise his principal that the checks were never indorsed by him. Moreover, the facts and circumstances are more conclusive than the legal imputation of knowledge under the doctrine of agency, for Kaplan admitted that he knew Magid's signature, and as early as April 16, 1944 he was aware that the indorsement on his check was not plaintiff's. Kaplan had Feldman's check prior to June 16 and must likewise have known that it was not indorsed by Magid. Therefore if Kaplan and Feldman had a cause of action against the respective banks by reason of the forgeries of Magid's signature, their conduct for a period of many months and until these suits were instituted on October 21, 1944 amounted to a ratification and adoption of all that

happened earlier and precluded them, as the real parties in interest, under par. 43, from setting up the forgery. Magid admittedly had no interest in the transaction.

Although the record does not disclose the exact date when Kaplan and Feldman learned that Rinella had the money and that the proceeds were not in escrow, they must have learned these facts prior to April 1944. Both of them received bank statements in February and each month thereafter. It is undisputed that the first notice given the Drexel Bank was August 31, and the Hyde Park Bank was not notified until September 30. Reading the record, one is convinced that neither Feldman nor Kaplan used any diligence whatever in examining his bank statements. If they had done so they would have had actual and complete knowledge of all the facts. They did know, however, that the money had been withdrawn from their accounts, and it would be charitable to characterize their inaction as nothing more than carelessness; we think it amounted to a purposeful breach of the duty owed the banks to report the discrepancies at a much earlier date. The notice of facts which Kaplan and Feldman admittedly had should have put them on inquiry, as it would any reasonably prudent person, and they should therefore be charged with actual knowledge of all facts which such inquiry would have developed. The facts which were in their possession may be briefly summarized as follows. Plaintiff and both his principals knew as early as January 6 that Magid had waited for three hours at the Brown Derby for Rinella to carry out his agreement to place the checks in escrow, and that Rinella had failed to appear; that when plaintiff returned to the drug store Kaplan's ''profane'' conversation indicated that he knew the checks had been left in Rinella's hands, entirely out of the control of either plaintiff or his principals; that notice of Rinella's failure to deliver the whiskey and the fact

that the checks were not in plaintiff's possession or under his control required immediate inquiry as to the disposition of the checks, and it may be assumed that such inquiry would have developed the fact that while Magid was waiting for Rinella at the Brown Derby Cafe the Feldman check had already been deposited by the cafe in the "intermediate" cashing bank, because the indorsements on the check indicated that it had been deposited in the intermediate bank, had been sent through clearing to the drawee bank, and had actually been paid by the drawee bank on January 5. All this could have been ascertained by a simple telephone call to the drawee bank. With knowledge of these facts, subsequent inquiry would have also shown that the Kaplan check was similarly deposited by the Brown Derby Cafe and paid by the defendant drawee bank on January 8, 1944, just three days later. The fact that the first check had been sent through for payment and paid by the drawee bank the day before Rinella had agreed to place it in escrow, showed conclusively that he had no intention of performing his escrow agreement, and knowing that plaintiff had not indorsed the checks and that they would not be accepted by the cashing bank or paid by the drawee bank without his indorsement, both plaintiff and his principals, as reasonably prudent men, ought to be charged with actual knowledge of the forgeries as early as the forepart of January. And of course notification to the banks would have resulted in the immediate return of the checks to the intermediate bank, a possible stop-payment order, and the return of the checks to the intermediate bank when they were presented to the drawee banks for payment. Such diligent steps would have afforded these banks some protection against the forged instruments. The plain fact is that Kaplan and Feldman were so eager to procure the whiskey that they failed to take any of these elementary precautions, but rather chose to

gamble on the probability that Rinella would still carry out the terms of his agreement and furnish the whiskey in spite of the fact that they knew, or certainly were charged with knowledge, that he had defaulted on his agreement to place the funds in escrow, that he had actually converted the proceeds to his own use, and that in order to do so he, or somebody for his benefit, had committed two forgeries. In making this decision, Kaplan and Feldman deprived the banks of the opportunity to protect themselves, as well as plaintiff and his principals, against loss. In *Findlay v. Corn Exch. Nat. Bank*, 166 Ill. App. 57, the court said that "The authorities are all agreed that in a case of this kind it is the duty of the depositor to notify the bank immediately upon his discovery of the forgery. There is some controversy in the authorities as to what results shall follow the breach by the depositor of his duty in this respect. We think the trend of the Illinois cases is, that the depositor who fails to notify his bank of the forgeries as soon as they are discovered loses all right of action against the bank. It is the depositor's duty to discover the forgery, and upon its discovery to promptly notify the bank." In *First State Bank & Trust Co. v. First Nat. Bank of Canton*, 314 Ill. 269, the delay in giving notice amounted to approximately three months. The amount there involved was less than $400. In discussing the delay the court said that it was negligent of the bank to pay out the money, but that the party relying on the forgery, "which seeks to recover the amount of the forged check, failed to report the forgery for upwards of three months. Prompt notice of forgery affords a bank which has been defrauded an opportunity to recover its loss or to prevent loss to others. If there is delay or negligence in discovering the forgery loss to others will be presumed." (Citing *Union Nat. Bank v. Farmers and Mechanics Nat. Bank* (Pa.), 16 A. L. R. Ann. 1120.) In the recent case of *National Bank of*

Republic v. Kaspar American State Bank, 369 Ill. 34, which followed the First State Bank & Trust Co. case, the court made the following observation: "The only Illinois case where this same question has been considered and passed upon by this court is favorable to the defendant's position, and, in our judgment, decides the issue. In First Nat. Bank v. Northwestern Nat. Bank, 152 Ill. 296, this court said: 'And where a drawee or a bank pays a bill of exchange or a bank check to an endorser who derives title through a prior forged endorsement, he may recover back the money so paid, on discovery of the forgery, provided he makes demand for repayment within a reasonable time after the discovery of such forgery.—(2 Daniel on Neg. Inst. secs. 1364, 1372; Canal Bank v. Bank of Albany, 1 Hill, 287; Williams v. Tishomingo Savings Institution, 57 Miss. 633.') This rule has been approved by various text writers, and to our knowledge has never been disputed. (Morse, Banks and Banking, (6th ed.) p. 1074; Joyce, Defenses to Commercial Paper, (2d ed.) p. 264.) In the latter work, the author states: 'And one who has made a payment on a forged bill or note may forfeit any right which he possesses to recover such payment by a failure to give notice until after an unreasonable period of time has elapsed after his discovery of the forgery.' While it is true that a drawee, like a drawer or payee, may not be under a duty to discover a forged endorsement (Hamlin's Wizard Oil Co. v. United States Express Co., 265 Ill. 156; United States Cold Storage Co. v. Central Manufacturing Bank, 343 id. 503;) we believe it is well settled, as previously stated by this court, (First Nat. Bank v. Northwestern Nat. Bank, supra,) that a drawee, to recover money paid to a cashing bank on a check with a forged endorsement, must notify the cashing bank within a reasonable time after discovering the forgery." The foregoing decisions are applicable even though the suits at bar were brought by the payee

rather than the depositors, Kaplan and Feldman, because in this state where a plaintiff who sues on a negotiable instrument to which he has legal title, is in fact merely the trustee or agent for another, the defendant may interpose any defense which might be set up against the beneficial owner, just as though the action had been brought in the latter's name. *Feulner v. Gillam,* 211 Ill. App. 348; *Morrison v. Nugent,* 311 Ill. App. 411.

As a result of these conclusions we are of opinion that both of these actions must fail because the repeated neglect to give notice to the defendant banks is fatal to plaintiff's right to recovery. So long as there was any possibility, however remote, of procuring delivery of the whiskey during the period of scarcity, the real parties in interest, Kaplan and Feldman, carried on negotiations with knowledge or imputed knowledge of the facts which should have been communicated to the banks, and it was only after these negotiations had broken down and after an unsuccessful attempt had been made to collect from Rinella, through various extensions of time, followed by confidence game charges, that the prospective purchasers, as an afterthought, resorted to proceedings against their banks. Suits were then brought in the name of their agent, the nominal payee of the checks, who admittedly had no interest in the transactions, and it would be unconscionable, under the circumstances, to permit Kaplan and Feldman to shift their loss to the defendant banks.

Accordingly the finding and judgment of the circuit court in this proceeding should be reversed, and it is so ordered.

*Finding and judgment reversed.*

Sullivan, P. J., and Scanlan, J., concur.