In re OSTROM–MARTIN, INC., Debtor.

Richard E. BARBER, Chapter 7 Trustee for Ostrom–Martin, Inc., Plaintiff,

v.

FIRST NATIONAL BANK OF CHIL-LICOTHE and Princeville State Bank, Defendants.

Bankruptcy No. 92–80099.
Adv. No. 92–8164.

United States Bankruptcy Court,
C.D. Illinois.

Oct. 31, 1996.

Barry M. Barash, Barash, Stoerzbach & Henson, Galesburg, IL, for Plaintiff.

Richard E. Barber, Galesburg, IL, Chapter 7 Trustee.

Gregg N. Grimsley, Leanna L. Karnopp, Carter & Grimsley, Peoria, IL, for Princeville Bank.

Michael T. Mahoney, Chillicothe, IL, Duncan G. Harris, Schiff, Hardin & Waite, Chicago, IL, One of Attorneys for First National Bank of Chillicothe.

## OPINION

WILLIAM V. ALTENBERGER, Chief Judge.

The facts of what occurred are basically not disputed and are set forth in previous opinions of this Court.[1] Kevin Martin was a director, shareholder and president of Ostrom–Martin, Inc. (OMI), a grain company with several facilities in neighboring communities. Kevin Martin and other members of his extended family, were involved in several related entities. The related entities involved with this litigation are summarized below.[2]

OMI whose officers, directors, and stockholders are:

| | | | |
|---|---|---|---|
| 1. | Kevin E. Martin | Stockholder, President & Director | 20% Stockholder |
| 2. | Gerald Martin | Stockholder, Vice–Pres. & Director | 20% Stockholder |
| 3. | Ellsworth Martin[3] | Stockholder, Vice–Pres. & Director | 10% Stockholder |
| 4. | Donna Martin[3] | Stockholder | 10% Stockholder |
| 5. | Kenneth Martin | Stockholder, Sec'y–Treas. & Director | 20% Stockholder |
| 6. | Ervin Martin | Stockholder | 20% Stockholder |
| 7. | Lorane Martin | Director | None |

Martin Farms of Princeville, Inc., (MFP), whose officers, directors, and stockholders are:

| | | | |
|---|---|---|---|
| 1. | Kevin E. Martin | Stockholder, Sec./Treas. & Director | 20% Stockholder |
| 2. | Ellsworth Martin | Stockholder, President & Director | 20% Stockholder |
| 3. | Gerald E. Martin | Stockholder, Vice–Pres. & Director | 20% Stockholder |
| 4. | Kenneth L. Martin | Stockholder, Vice–Pres. & Director | 20% Stockholder |
| 5. | Ervin E. Martin | Stockholder | 20% Stockholder |

Martin Fertilizer: A trade name of Martin Farms of Princeville, Inc.

---

**1.** Those previous opinions are found in *In re Ostrom–Martin, Inc.*, 155 B.R. 997 (Bkrtcy. C.D.Ill.1993); and *In re Ostrom–Martin, Inc.*, 188 B.R. 245 (Bkrtcy.C.D.Ill.1995).

**2.** The summation of the "Martin Entities" is taken from the settlement agreement entered into between Richard Barber as Trustee for OMI and Rumbold & Kuhn, Inc. and Bruce Graham, in an adversary proceeding brought by the Trustee against them which was filed in this adversary as an attachment to the response filed by Elwin Rumbold on June 13, 1994, to the Trustee's motion to compel discovery and for sanctions.

**3.** Ellsworth Martin and Donna Martin are husband and wife.

Each Year OMI was required to renew its grain dealer licenses issued by the Illinois Department of Agriculture (DEPARTMENT). 225 ILCS 630/4. The application for renewal was due within 90 days after the close of the fiscal year, which, for OMI was the end of November. 225 ILCS 630/2. Upon application, the DEPARTMENT could extend the time for filing the application an additional sixty days. For grain dealers like OMI, the application had to be accompanied by a financial statement, approved or certified by a licensed independent public accountant. One of the requirements which must be satisfied in order to have a license renewed is referred to as a one-to-one working capital ratio. Section 4(e)(1) of the Grain Dealers Act provides:

> The applicant or licensee's financial statement and balance sheet show a current ratio of the total adjusted current assets to the total adjusted current liabilities of at least one to one. Adjusted current assets shall be calculated by deducting from the stated current assets shown on the balance sheet submitted by the applicant or licensee any non-liquid current asset including, but not limited to, notes receivable from officers or stockholders, accounts receivable from officers or stockholders, stock subscriptions receivable, intra-company receivables or receivables from an affiliate or any other related party receivables. Any disallowed asset shall be netted against any related liability and the net result, if an asset, shall be subtracted from the current assets, or if a liability, it shall remain an adjusted current liability.

225 ILCS 630/4(e)(1).

According to the testimony of Laura Ehnle (EHNLE), OMI's bookkeeper, monies had been transferred back and forth between the Martin entities for many years. EHNLE kept separate ledgers, showing the inter-entity transfers and balances due. The following summarizes the transfers between OMI and MFP, beginning with stated balances due OMI on December 31, 1990, March 31, 1991, and June 30, 1991, and itemizing all transactions thereafter through the end of the fiscal year:

| DATE | OMI to MFP | MFP to OMI | $ DUE MFP | $ DUE OMI |
|---|---|---|---|---|
| 12–31–90 | | | | $ 1,230,000 |
| 3–31–91 | | | | 320,000 |
| 6–30–91 | | | | 322,000 |
| 7–5–91 | | $ 7,000 | | 315,000 |
| 7–8–91 | | 190,600 | | 124,400 |
| 7–10–91 | $ 23,000 | | | 147,400 |
| 7–11–91 | 18,000 | | | 165,400 |
| 7–25–91 | 45,000 | | | 210,400 |
| 7–23–91 | 160,000 | | | 370,400 |
| 7–29–91 | | 150,000 | | 220,400 |
| 8–30–91 | 83,975.89 | | | 304,375.89 |

On August 31, 1991, the end of the fiscal year, MFP paid OMI $304,375.89. However, as was later discovered by the accountants, at the time the transfer was made, MFP did not have the cash balance necessary to make the payment. The initial internal balance sheet prepared for MFP for the fiscal year ending August 31, 1991, reflects shareholder loans of $605,000 having been made prior to August 31, 1991, which, if accurate, would have enabled MFP to make the payment to OMI. Those loans were never in fact made.

On September 3, 1991, in an effort to keep OMI afloat, Kevin Martin had two large checks issued. One check was payable to Rumbold and Kuhn, a grain company owned by Elwin Rumbold and his family, in the amount of $300,000, and was delivered to Rumbold and Kuhn by Ervin and Lorane Martin. OMI executed a promissory note to

Rumbold and Kuhn. On that same date, Rumbold and Kuhn loaned MFP $305,000.

The second large check, which is the subject of this adversary proceeding, was issued on that same date and was made payable to Rumbold Valley Farms, a farming entity, also owned by Elwin Rumbold and his family, in the amount of $300,000. At Kevin Martin's direction, EHNLE logged the check on OMI's records as a loan to Rumbold Valley Farms. The next day, Kevin Martin placed an endorsement on the reverse side of the check "Pay to the order of Martin Farms, Inc." Beneath the endorsement, Kevin Martin added the words "Rumbold Valley Farms" and signed "Elwin Rumbold." Kevin Martin deposited the check in the MFP account at the First National Bank of Chillicothe (CHILLICOTHE BANK). The CHILLICOTHE BANK accepted the check for deposit and credited the account of MFP. The Princeville State Bank (PRINCEVILLE BANK) paid the check when it was presented by the CHILLICOTHE BANK.

Sometime later, when the cancelled check was returned to OMI, Kevin Martin obliterated the words "Rumbold Valley" on the face of OMI's check and substituted the word "Martin" thereon so that the payee was shown as "Martin Farms". On the reverse side of the check, Kevin Martin obliterated the endorsement along with the forged signature of Elwin Rumbold. On the returned deposit slip used by MFP to deposit the check at the CHILLICOTHE BANK, Kevin Martin obliterated the words "Rumbold Valley Farms" and substituted "OMI" in their place. According to EHNLE's testimony, to complete the switch, in November or December of 1991, at Kevin Martin's direction, OMI's books were changed to reflect that the payee of the check was MFP rather than Rumbold Valley Farms.

With time running out, and unable to meet the one-to-one ratio required to renew the grain dealer's license, Kevin Martin confessed his misrepresentations to the accountants and the Illinois Department of Agriculture, and OMI surrendered its grain dealer's license on December 30, 1991, with its operations being taken over by the Department of Agriculture. An involuntary petition was filed against OMI on January 14, 1992, and an order for relief was later entered.

After the order for relief was entered, the Chapter 7 Trustee sued Rumbold and Kuhn and the case was later settled, with the Trustee recovering $300,000. The Chapter 7 Trustee also brought this adversary proceeding against both the CHILLICOTHE BANK and the PRINCEVILLE BANK to establish their liability for honoring a check with a forged endorsement. This Court has issued a previous ruling in this adversary proceeding, denying both BANKS' motions to dismiss and the Trustee's motion for judgment on the pleadings, finding that the parties had raised questions of fact. At that point, because the legal issues had not been adequately briefed and discovery had not been completed, this Court determined that any resolution of the case would be premature. This Court did rule that the applicable § 3–404 and § 3–405 of the Uniform Commercial Code (UCC), Ill.Rev.Stat.1991, ch. 26, ¶ 3–404 and ¶ 3–405, providing for the "fictitious payee rule" were those in effect prior to their amendment effective January 1, 1992. *In re Ostrom–Martin, Inc.*, 155 B.R. 997 (Bkrtcy.C.D.Ill.1993).

After completing discovery, both the CHILLICOTHE BANK and the PRINCEVILLE BANK filed motions for summary judgment which were heard on May 22, 1995. The CHILLICOTHE BANK contended that it had a number of complete defenses to the Trustee's complaint, including that it was entitled to judgment as a matter of law because the Chapter 7 Trustee could not bring a direct action against it, but must sue the PRINCEVILLE BANK. While rejecting most of the reasons put forth by the CHILLICOTHE BANK in support of its motion for summary judgment, this Court held that the Chapter 7 Trustee could not bring a direct action against the CHILLICOTHE BANK and allowed its motion for summary judgment. *In re Ostrom–Martin, Inc.*, 188 B.R. 245 (Bkrtcy.C.D.Ill.1995). This Court denied the motion for summary judgment filed by the PRINCEVILLE BANK on the grounds that the portions of the sections of the UCC being relied upon were inapplicable

or that questions of fact were present that prevented summary judgment.

The Chapter 7 Trustee's action against the PRINCEVILLE BANK centers upon the actions of Kevin Martin. Kevin Martin asserted his fifth amendment privilege against self-incrimination during his deposition. After an in camera hearing, Judge Larry Lessen, a fellow Bankruptcy Judge for the Central District of Illinois, found that Kevin Martin had reasonable cause to believe that any or all of the answers to certain questions might be used against him in a criminal prosecution, and his testimonial privilege was sustained. As of the date of the trial, Kevin Martin had yet to be indicted but remained subject to prosecution.

After a trial this Court took the matter under advisement. The two general rules with which this Court started its opinion when ruling on the BANKS' motions for summary judgment are also the starting point for this opinion being issued after the trial. The first involves the status occupied by the Trustee in this proceeding. Section 323(b) of the Bankruptcy Code gives the trustee the right to prosecute causes of action belonging to the estate. 11 U.S.C. § 323(b). Such actions fall into two categories: those brought by the trustee as successor to the debtor's interest in the estate; and those brought under the trustee's avoiding powers. 2 *Collier on Bankruptcy*, ¶ 323.02[4], p. 323–10. Under the first group, the trustee stands in the shoes of the debtor and may only institute whatever actions the debtor could have brought itself and is subject to the same defenses as could have been asserted by the defendant had the action been brought by the debtor. *Yale II Mining Assocs. v. Gilliam*, 586 F.Supp. 893 (W.D.Va.1984); *In re Ahead by a Length*, 100 B.R. 157 (Bkrtcy.S.D.N.Y.1989). It is only when the trustee is exercising his avoiding powers that he accedes to a superior status and possesses extraordinary rights. The present case is not brought under the Trustee's avoiding powers, but rather the Trustee is proceeding in the shoes of OMI, and he may not prevail, if OMI would itself have failed.

The second involves a general statement of the applicable state law involving forged endorsements on checks. As a general rule, a depositary or drawee bank which pays over a forged endorsement is liable, unless an exception to the general rule is applicable. Bailey & Hagerdorn, *Brady on Bank Checks*, ¶ 31.1 (7th ed. 1992). Exceptions to the general rule involve the "fictitious payee" rule, ratification, substantial negligence on the part of the drawer, or that no loss resulted. 2 White & Summers, *Uniform Commercial Code*, §§ 19–3, 19–4 (4th ed. 1995); *Ambassador Financial Services, Inc. v. Indiana National Bank*, 605 N.E.2d 746, 19 UCC Rep.Serv.2d 1121 (Ind.1992). In the context of this case there was a forged endorsement and the PRINCEVILLE BANK is liable unless it can bring itself within one of the exceptions.

The PRINCEVILLE BANK's first affirmative defense pleads § 3–404 of the UCC (ratification); § 3–405 of the UCC (fictitious payee); and § 3–406 of the UCC (negligence). Its fourth affirmative defense pleads OMI suffered no damages. In its post-trial brief, it addresses the defenses of ratification, fictitious payee, negligence, and lack of damages due to repayment.

Section 3–404(2) of the then applicable UCC provided as follows:

(2) Any unauthorized signature may be ratified for all purposes of this Article. Such ratification does not of itself affect any rights of the person ratifying against the actual signer. 1961, July 31, Laws 1961, p. 2101, § 3–404.

The UCC Comments stated:

3. Subsection (2) is new. It settles the conflict which has existed in the decisions as to whether a forgery may be ratified. A forged signature may at least be adopted; and the word "ratified" is used in order to make it clear that the adoption is retroactive, and that it may be found from conduct as well as from express statements. Thus it may be found from the retention of benefits received in the transaction with knowledge of the unauthorized signature; and although the forger is not an agent, the ratification is governed by the same rules and principles as if he were.

This provision makes ratification effective only for the purposes of this Article. The unauthorized signature becomes valid so far as its effect as a signature is concerned. The ratification relieves the actual signer from liability on the signature. It does not of itself relieve him from liability to the person whose name is signed.

The Illinois Code Comments stated:

This subsection makes it clear that a forgery can be ratified. Illinois courts have previously so held. *Magid v. Drexel Nat'l Bank,* 330 Ill.App. 486, 71 N.E.2d 898 (1st Dist.1947), petition for leave to appeal denied, 331 Ill.App. xv. Cf. *Bartlett v. First Nat'l Bank,* 247 Ill. 490, 93 N.E. 337 (1910).[4]

■■■ Section 3–404(2) permits ratification by a drawer of a check paid on a forged endorsement. *Brady on Bank Checks,* ¶ 29.10 (7th ed.). Ratification may be express or implied and occurs when the principal, with full knowledge of the material facts, takes a position which is inconsistent with any other position than intent to adopt the act, or where the principal retains the benefits. *Stathis v. Geldermann, Inc.,* 258 Ill. App.3d 690, 630 N.E.2d 926, 196 Ill.Dec. 761 (1st Dist.1994). Ratification and authorization are ordinarily questions of fact properly determined after a trial. *Johnson v. North Bank,* 99 Ill.App.3d 320, 426 N.E.2d 4, 55 Ill.Dec. 220 (1st Dist.1981).

In *Wiest v. First Citizens National Bank,* 3 UCC Rep.Serv. 875, 1966 WL 8972 (Pa.Ct. Com.Pl.1966), *aff'd per curiam* 209 Pa.Super. 751, 226 A.2d 227 (1967), the plaintiff's secretary was embezzling funds from a checking account maintained by the plaintiff at a local bank. To hide the embezzlement, the secretary forged a check on another checking account at another bank and deposited the forged check into the bank account at the local bank. When the plaintiff discovered the forgery, he sued the other bank. Finding in favor of the other bank, the court stated:

[W]e are persuaded that the principle enunciated in two lower court cases cited by the defendant is valid and is applicable to the facts of this case. We refer to *Gier v. Corn Exchange National Bank and Trust Company,* 71 D & C 529 and to *Girard Trust Corn Exchange Bank v. Fidelity–Philadelphia Trust Company,* 31 D & C2d 575. We agree with the conclusion therein expressed that proof of the breach of a legal obligation does not warrant recovery unless there is affirmative evidence of actual consequent damage. Breach of the contractual obligation of the defendant to the plaintiff is claimed in this case, but the plaintiff has not alleged that he sustained actual consequent damage. The funds transferred by the embezzling employee from the plaintiff's inactive bank account to the active office bank account were not removed from the dominion and control of the plaintiff. Certainly it would be illogical to adjudge that the plaintiff is entitled to recover monies which he has received and which he has either retained or used. (The plaintiff has informed the court that he is not seeking nominal damages.)

There was another legal consequence of the plaintiff's retention of the proceeds of the forgery; he thereby ratified the unauthorized signature. (UCC § 3–404(2)) Although the forger was not an agent of the plaintiff, ratification in such a situation is governed by the same rules and principles as if she had been an agent of the plaintiff. (UCC Comment 3, § 3–404).

■■■ As a general rule, ratification from silence requires that the principal have full knowledge of all material facts. *Evanston Bank v. ContiCommodity Services, Inc.,* 623 F.Supp. 1014 (N.D.Ill.1985). Speaking to this exception, the court in *Inn Foods, Inc. v. Equitable Co–Operative Bank,* 45 F.3d 594, 25 UCC Rep.Serv.2d 1145 (1st Cir.1995), a forgery case, stated:

Under Massachusetts law, ratification of an agent's acts may be express or implied and, as a general proposition, the principal must have full knowledge of all material

---

**4.** These comments can be found as part of S.H.A. (Illinois Annotated Statutes) 1991, Ch. 26, ¶ 3–404.

facts. (Citations). Massachusetts courts, however, do not always require that the principal have actual knowledge. There may be ratification when the principal "purposely shut[s] his eyes to means of information within his own possession and control." (Citation) (ratification may be implied where corporation directors have "knowledge of such facts or circumstances as would put a reasonable person on inquiry and which would lead to full discovery"). (Citations omitted)

■ In *Chalet Ford, Inc. v. Red Top Parking, Inc.*, 62 Ill.App.3d 270, 379 N.E.2d 88, 19 Ill.Dec. 573 (1st Dist.1978), the court applied the "knew, or should have known" standard in concluding that ratification had occurred. Addressing this issue the court in *Progress Printing v. Jane Byrne Pol.Com.*, 235 Ill. App.3d 292, 601 N.E.2d 1055, 176 Ill.Dec. 357 (1st Dist.1992), stated:

> Ratification is the equivalent of authorization, but it occurs after the fact, when a principal gains knowledge of an unauthorized transaction but then retains the benefits or otherwise takes a position inconsistent with nonaffirmation. Generally, the question of ratification turns on the principal's intent to affirm. As with their objection to the Pitz and Roque orders, the essence of defendants' argument is the lack of evidence of express ratification by the candidate. Like authority, however, ratification need not be express; it may be inferred from surrounding circumstances, including long-term acquiescence, after notice, to the benefits of an unauthorized transaction. Of significance here, although normally a principal's actual knowledge of the transaction is essential, "one whose ignorance or mistake was the result of gross or culpable negligence in failing to learn the facts will be estopped as if he had full knowledge of the facts." 18 Ill.Law & Prac. *Estoppel* § 32 at 84 (1956). (Citations omitted.)

Ratification will also be found where a corporation, with knowledge of the facts, retains the benefit of an unauthorized transaction. *Harris Trust & Savings Bank v. Joanna–Western Mills Co.*, 53 Ill.App.3d 542, 368 N.E.2d 629, 11 Ill.Dec. 78 (1st Dist.1977).

■ Accordingly, in order for the PRINCEVILLE BANK to succeed with its ratification defense, it must establish that OMI benefited and that those in charge of OMI had knowledge of the unauthorized signature. It did.

Regardless of which path the check would have taken, the funds were to go to MFP. MFP was one of the Martin Entities. OMI and MFP had common ownership. Monies were regularly transferred back and forth as needed. OMI stood to benefit from those actions, as without them OMI's books and records would not show the one-to-one ratio required to renew OMI's grain dealer license. The funds ended up where they had to end up to benefit OMI by allowing it to renew the license.

The starting point as to the knowledge element is Kevin Martin. Kevin Martin was OMI. Although he was only a 20% stockholder, one of six stockholders, one of five directors, and one of four officers, he controlled and ran OMI. He was both the Chief Executive and Financial Officer. He gave the directions to write the checks which directions were honored by EHNLE. He had access to the check to modify it. He gave the directions to modify OMI's records after the check was returned. He certainly had knowledge of the unauthorized signature.

The bookkeeper, EHNLE, also had knowledge of Kevin Martin's activities. She has a college degree with a major in agricultural industries. Her testimony left this Court with the impression she was an intelligent and savvy individual who possibly knew, or at least, had strong suspicions, as to what Kevin Martin was doing through his various improper activities. She had access to the check and the books and records and obeyed Kevin Martin's directions to modify OMI's records.

EHNLE's concern about Kevin Martin's other improper activities was so great that she caused those concerns to be communicated to other stockholders, directors and officers. In general, the knowledge of or notice to officers of a corporation is imputed to the corporation. *People ex rel. Daley v. Warren Motors, Inc.*, 114 Ill.2d 305, 500 N.E.2d 22,

102 Ill.Dec. 400 (1986). EHNLE testified that she had discussed KEVIN's altering of checks with some of the directors and stockholders, and though one director and stockholder was very concerned, at least one director "didn't want to hear it." No steps were taken to prevent further improper actions. The companion check to the one at issue here, to Rumbold and Kuhn, for $300,000.00, was delivered to that company by one of OMI's directors and shareholders. While he did not testify at trial and there is no evidence in the record that he knew the details of the transaction, his role as mere courier is suspect. This Court finds that the other stockholders, directors and officers of OMI either closed their eyes and ignored their responsibilities, or went along with Kevin Martin's activities, to keep OMI afloat.

These total actions of Kevin Martin, EHNLE, and others responsible for OMI, constitute knowledge, and when taken in connection with the benefit OMI received, constitute ratification.

Section 3–405(1)(b) and (c) provided as follows:

(1) An indorsement by any person in the name of a named payee is effective if

. . . .

(b) a person signing as or on behalf of a maker or drawer intends the payee to have no interest in the instrument; or

(c) an agent or employee of the maker or drawer has supplied him with the name of the payee intending the latter to have no such interest.

The UCC Comments stated in part:

3. Subsection (1)(b) restates the substance of the original subsection 9(3). The test stated is not whether the named payee is "fictitious," but whether the signer intends that he shall have no interest in the instrument. The following situations illustrate the application of the subsection.

. . . .

4. Paragraph (c) is new. It extends the rule of the original Subsection 9(3) to include the padded payroll cases, where the drawer's agent or employee prepares the check for signature or otherwise furnishes the signing officer with the name of the payee. The principle followed is that the loss should fall upon the employer as a risk of his business enterprise rather than upon the subsequent holder or drawee. The reasons are that the employer is normally in a better position to prevent such forgeries by reasonable care in the selection or supervision of his employees, or, if he is not, is at least in a better position to cover the loss by fidelity insurance; ...

The provision applies only to the agent or employee of the drawer, and only to the agent or employee who supplies him with the name of the payee. The following situations illustrate its application.

a. An employee of a corporation prepares a padded payroll for its treasurer, which includes the name of P. P does not exist, and the employee knows it, but the treasurer does not. The treasurer draws the corporation's check payable to P.

b. The same facts as a, except that P exists and the employee knows it but intends him to have no interest in the check. In both cases an indorsement by any person in the name of P is effective and the loss falls on the corporation.

Section 3–406 provided as follows:

Any person who by his negligence substantially contributes to a material alteration of the instrument or to the making of an unauthorized signature is precluded from asserting the alteration or lack of authority against a holder in due course or against a drawee or other payor who pays the instrument in good faith and in accordance with the reasonable commercial standards of the drawee's or payor's business. 1961, July 31, Laws 1961, p. 2101, § 3–406.

Before applying either § 3–405 or § 3–406, a distinction must be drawn based upon the time Kevin Martin formed the intent to divert the check. In discussing acts by authorized parties, White—Summers *Uniform Commercial Code,* Fourth Edition, Vol. 2, § 19–4 b., states:

When a treasurer draws a check to a payee who is either fictitious or who is one not intended to have any rights in the check, the treasurer is made the "holder"

by 3–404(b)(1); and 3–404(b)(2) makes an indorsement by any person effective. There is a distinction here between the case in which a treasurer forms the intention to steal before he or she has pen in hand and the case in which he or she decides on the spur of the moment to steal a check after having written it with an honest intent. The latter case is not covered by 3–404(b) because the treasurer's "intent"—determined at the time of signing—was for the named payee to have the funds. Even in that case, the treasurer's status within the company combined with his or her later indorsement will usually bind the company under 3–405(b). In that case our treasurer is somebody "entrusted with responsibility" and 3–405(b) makes his or her signature effective. Under the pre–1990 Code, the latter case would have been handled under 3–406 on negligence; it was not covered by 3–405.[5]

In the case before this Court, for the reasons previously stated, it still is not known when Kevin Martin formed the intent to divert the check. If he had that intent at the time he requested the check, § 3–405 would be applicable. If he formulated that intent later, § 3–406 would be the applicable section.

◼ The PRINCEVILLE BANK contends that the "fictitious payee rule" defeats the Trustee's cause of action. A focal point of dispute since the onset of this case was the applicability of the "fictitious payee rule" and the question whether Kevin Martin intended Rumbold Valley Farms to have an interest in the check when it was written. Under § 3–405 of the UCC, as it then provided, a forged endorsement is effective if the person signing on behalf of the drawer "intends the payee to have no interest in the instrument." The Trustee concedes that if the rule applies, this action will fail, but contends Rumbold Valley Farms was the intended payee and that the intent to divert the check was formed later, after Rumbold Valley Farms refused to go along with the accounts receivable swap. At the present time, and as long as Kevin Martin remains shrouded in silence, the exact reason for making the check payable to Rumbold Valley Farms and the path it took from Kevin Martin's hands to the PRINCEVILLE BANK will remain unknown. His true intent presents a question of fact which, based on the record, can be resolved only by speculation. Therefore, there is no basis for this Court to find for the PRINCEVILLE BANK under § 3–405 of the UCC.

◼ However, accepting the Trustee's position that Kevin Martin formed the intent after the check was written, § 3–406 of the UCC comes into play. Under § 3–406 of the UCC, the Trustee loses if OMI, through its negligence, substantially contributed to the forging of the indorsement and the PRINCEVILLE BANK acted in good faith and in accordance with reasonable commercial standards of its business. EHNLE testified that prior to the check at issue, Kevin Martin had altered other checks and that she had called these actions to the attention of other directors and officers. It was at least negligence for OMI, acting through these other directors and officers, to not remove Kevin Martin or put in place controls that would prevent additional alterations.

The more difficult issue under § 3–406 of the UCC is whether the PRINCEVILLE BANK acted in good faith and in accordance with reasonable commercial standards. While this Court's sense (gut feeling) is that it did, it was not proven. The only testimony in that regard was that of an employee and the president of CHILLICOTHE BANK. Robin Mathis, a teller at the CHILLICOTHE BANK, testified that she handled the check according to bank policy, checked for an endorsement, and processed the check. William Patek, President of the CHILLICOTHE BANK, testified that, based upon his banking experience, the PRINCEVILLE BANK followed normal procedures. There was no testimony from employees or officers of the PRINCEVILLE BANK. Therefore, there is no basis for this

---

5. In considering the applicable UCC section and discussions of those sections found in various cases, that it must be kept in mind that under the pre–1990 UCC, § 3–405 set forth the Fictitious Payee Rule, and § 3–406, the rule on negligence, while under the 1990 UCC, § 3–404 governs the Fictitious Payee Rule and § 3–406, the rule on negligence.

Court to find that the PRINCEVILLE BANK acted in good faith and in accordance with the reasonable commercial standards of its business.

Among the defenses available to a bank in an action by a drawer to recover for improper payment of a check, but not raised by the PRINCEVILLE BANK, in so many words, is the "intended payee" defense. A discussion of this defense was set forth in this Court's previous opinion on the motions for summary judgment and need not be repeated. It is sufficient to merely state that a bank establishes the "intended payee" defense when it proves the following elements:

(1) The proceeds of the check reached the person intended by the drawer to receive them; AND

(2) The drawer has suffered no loss or adverse effect on its rights in the transaction that was proximately caused by the bank's improper payment.

Those elements are present in this case. Kevin Martin did not divert the funds for his personal gain. Rather, when he decided to issue the check and forge the indorsement or when it appeared that Rumbold Valley Farms either would not accept the check or participate in Kevin Martin's purported scheme to substitute an unrelated-entity receivable, he forged the endorsement on the check, endorsing it over to MFP, thereby bypassing Rumbold Valley Farms and directly depositing the check into the account of MFP, where he intended the check proceeds to ultimately go.

Earlier in this adversary, before the trial, this Court ruled that the Trustee could not bring an action against the CHILLICOTHE BANK. However, an order was never entered. It should be.

This Opinion is to serve as Findings of Fact and Conclusions of law pursuant to Rule 7052 of the Rules of Bankruptcy Procedure.

See written Order.

## ORDER

For the reasons set forth in the Opinion entered this day, IT IS HEREBY ORDERED that judgment is entered in favor of the PRINCEVILLE STATE BANK and against the TRUSTEE.

IT IS FURTHER ORDERED that the motion for summary judgment filed by the FIRST NATIONAL BANK OF CHILLICOTHE is hereby GRANTED and judgment is entered in favor of the FIRST NATIONAL BANK OF CHILLICOTHE and against the TRUSTEE, subject to the previous finding by this Court that PRINCEVILLE BANK vouched in the FIRST NATIONAL BANK OF CHILLICOTHE, pursuant to § 3–803 of the UNIFORM COMMERCIAL CODE.