GUS STATHIS, Plaintiff-Appellant, v. GELDERMANN, INC., *et al.*, Defendants-Appellees.

First District (2nd Division)   No. 1—92—1427

Opinion filed January 18, 1994.—Rehearing denied March 2, 1994.

Leonard M. Ring & Associates, P.C., of Chicago (Leonard Ring and William Jovan, of counsel), for appellant.

Coffield, Ungaretti & Harris (Kevin M. Flynn, of counsel), and Robert A. Chapman, P.C. (Robert Chapman, of counsel), both of Chicago, for appellees.

JUSTICE HARTMAN delivered the opinion of the court:

Plaintiff, Gus Stathis, brought this action to recover damages from defendants, Geldermann, Inc., and Geldermann Securities, Inc. (GSI) (collectively Geldermann), for the conversion of his property and conspiracy to usurp a corporate opportunity. The circuit court granted Geldermann's motion for summary judgment from which plaintiff appeals. The issues raised are whether summary judgment was properly entered for Geldermann on the conversion and conspiracy charges in consideration of the deposition testimony, documents, and answers to interrogatories presented. The following facts were derived from deposition testimony and documentary evidence.

Plaintiff, his son, James Stathis, and James' business partner, John Martorello, formed Star Clearing, an Illinois general partnership. The partnership was to engage in the business of providing clearing services and floor brokerage in connection with the purchase and sale of equity stock options on the Chicago Board of Options Exchange (CBOE). Two corporate partners, Star Clearing, Inc., and Scorpio, Inc., were established to be mechanisms through which the Star Clearing partnership was to be funded. Plaintiff's capital loans and contributions totaling $1,090,000 to Star Clearing and the entities which controlled Star Clearing comprised the entire capital investment of the partnership. Plaintiff was also an officer, director, and the controlling shareholder of both partner corporations, owning the voting preferred stock. James and Martorello personally guaranteed repayment of the loans plaintiff made to fund Star Clearing and both appointed plaintiff as their proxies with respect to their voting stock in Star Clearing, Inc., and Scorpio, Inc.

James was designated as the manager and supervised the day-to-day management of the options clearing business for Star Clearing, subject to the vote of the voting partners. His duties and limitations of power were prescribed by the partnership agreement. Specifically, the manager was denied power or authority to do the following things without prior unanimous vote of the voting partners: dispose of the partnership's good will, perform any act which would make it impossible to carry on the ordinary business of the partnership, confess a judgment against the partnership, materially affect the business or assets of the partnership, and authorize any action the result of which would be to (1) merge, consolidate, agree to merge, or agree to consolidate the partnership into or with any other business entity; (2) liquidate, reorganize, or recapitalize the partnership or

adopt any plan to do so; (3) make or cause the partnership to become a party to any contract or commitment outside of the ordinary course of business; (4) sell, agree to sell, or otherwise dispose of all or substantially all the assets of the partnership; and (5) otherwise materially affect the business or assets of the partnership.

Kevin Mack, president of Geldermann, Inc., testified that Geldermann was looking for potential acquisitions of clearing houses to clear trades on the CBOE. Mack, unsuccessful in spearheading a drive to acquire several clearing house companies, directed Dennis Zarr, a Geldermann vice-president, to search for a CBOE firm that could clear business for Geldermann. Star Clearing became the object of negotiations. Zarr met with James and told him that Geldermann had $125 million to commit for CBOE operations. James told Zarr that Star needed capital to replace plaintiff's loans and investments.

Plaintiff disapproved of the manner in which Star Clearing's business was being conducted and was concerned about his $1,090,000 investment. On being advised of Geldermann's interest in Star Clearing, plaintiff wrote a letter to James, dated April 11, 1986, authorizing negotiations with Geldermann "on behalf of my interest" for a deal which "would be beneficial to all concerned." It stated that "[w]hatever deal you may or may not conclude, I will abide by it and I am obligated to accept." The evidence revealed that Geldermann neither had knowledge of this letter nor did it request that such a letter be written.

Plaintiff testified that the purpose of the letter was to "negotiate and report back to me." He believed that the company could not be sold "without resolutions and signing away the company." He gave the letter to authorize negotiations because "I own the company," but the letter by itself "didn't sign the company over."

On July 22, 1986, after further meetings, Zarr sent a memo to Mack concerning his meeting at Star Clearing, informing Mack that the "principals" would consider a joint venture and/or buy-out. He told Mack that he would like to set up a meeting with the "Star Clearing owners" if Mack was in agreement. Zarr arranged a meeting with Salvatore Caputo, another Geldermann vice-president, Mack, Martorello, and James on August 26, 1986. Zarr testified:

> "I wanted [Mack] to meet Jim Stathis and John Martorello. It was my understanding that they had to pay their [sic] father back the money he lent them to run the company."

Zarr was told that

> "they had to pay the capital back that was lent to them by their [sic] father and that he was very, very adamant about, I mean he had to get that money out."

Zarr stated that "they were trying to get Geldermann to put capital in so that they could pay it back."

Subsequently, Mack met at dinner with Caputo, Zarr, James, and Martorello. At this meeting, James told the Geldermann people that if they wanted Star Clearing, they would have to pay enough to return to plaintiff the money that he loaned to or invested in Star Clearing plus $100,000. Mack said that this was no problem. James wanted $10 million in cash and a $10 million line of credit. Mack said that this would be no problem.

After the dinner meeting, Zarr and Caputo went to see James and Martorello. Zarr made notes during the meeting, which included the following:

"Must replace his father[']s capital of $980,000 before deal is signed. This is very important and non-negotiable. *** What if deal does not work out—Star Clearing has lost [its] name and customers to Geldermann—Geldermann wins—Star Loses."

Zarr believed that thereafter "our lawyers got involved and the accountants got involved."

A letter of intent was drafted, the final draft dated November 11, 1986, which stated, in part:

"This letter outlines the basic points of our discussion of the Star facilities and personnel to become part of Geldermann, Inc. This letter is subject to preparation of a definitive agreement and approval of the Geldermann Board of Directors and ConAgra, Inc., if necessary."

Zarr testified that Geldermann's focus was to get into the business itself rather than developing a clearing house that it would trade through. James seemed to offer the opportunity to do this faster than clearing through another company. Zarr stated:

"I always considered it from what I understood is the fact that Geldermann became a clearing member and the employees joined Star — The employees that stayed or John or Jim Stathis or Martorello wanted to hire joined Geldermann and the capital that was in Star Clearing was paid and returned to his father."

As far as Zarr and Caputo knew, no one from Geldermann ever checked to see what interest plaintiff had in Star. Caputo had the responsibility for clearing relationships for Geldermann. Caputo testified that Geldermann's parent, ConAgra, Inc., would require that the acquisition of Star Clearing be a very lengthy and time-consuming chore. Geldermann did not want to waste time as "[w]e wanted to get into business." Caputo stated to acquire Star's business, they would have checked into Star Clearing's ownership and "those kinds of things." Throughout the negotiations, one of the points James insisted on was the money that plaintiff invested had to

be repaid. Both Zarr and Caputo testified that Geldermann rejected this request. Caputo had no discussions with plaintiff, himself.

On November 10, 1986, Zarr signed a letter on Star Clearing letterhead which stated that "negotiations had taken place and a deal had been struck between Star Clearing and Geldermann, Inc." It added that "Mr. [James] Stathis will have power over all floor operations and any deals entered into Market Makers and Customer Agents."

Subsequently, plaintiff, in discussion with James concerning the state of negotiations with Geldermann, was told by James that he thought Geldermann would pay $3 million for Star Clearing. Plaintiff believed that the return of his loans and capital stock was expected from the transaction with Geldermann. James averred that it was always understood that the source of these funds would be from Geldermann; that James personally had no funds; and that both James and plaintiff knew it would be impossible for James to personally make any such payment to plaintiff.

Mack testified that during discussions with James concerning Star Clearing, James told him who owned Star Clearing, but Mack did not recall the name. He did not investigate to see who the owners of Star Clearing were and was not sure whether Geldermann did so or not. In December 1986, Mack sent Denise Hagerty, the chief financial officer of Geldermann, to Star's office to inspect the books and records. Everything, including the Star Clearing partnership agreement, was apparently made available to her.

James averred that Geldermann's representatives knew at all times that James was only the manager of Star Clearing, not its principal owner. Nevertheless, on December 24, 1986, Geldermann executed an agreement with James, using James' home address. It provided that James was retained to manage Geldermann's clearing, market maker, and floor brokerage operations on the CBOE in return for a monthly draw and other benefits. The agreement was to terminate on May 1, 1990. In the event of termination, there was a covenant not to compete. Among its provisions, part II stated:

> "All business of [James] Stathis (individually and that of Star Clearing and GRK-JNO Investments, Inc.) and all business of GSI, as it may respectively relate to the following, shall be deemed GSI business (the 'GSI Business')."[1]

Caputo characterized the relationship as follows: "[James] Stathis was not a manager to me, he was the person we were hiring."

---

[1] The circuit court found that this December 24, 1986, agreement between Geldermann and James was not an employment agreement "but a buy-out agreement or sale of the assets of Star Clearing"; therefore, "[n]o

After the agreement became effective, Star employees worked for Geldermann in the facilities that Star Clearing had previously maintained. Caputo compiled an agenda of how Geldermann was going to operate at Star and who was going to pay for the facilities. The name on the door was changed to Geldermann Securities, Inc. Star Clearing's market markers also apparently came into Geldermann.

A document typed on Geldermann letterhead stated in pertinent part that Geldermann's strategy was to accomplish its objectives of entering the clearing market by recruiting current personnel of Star Clearing and its customer business. In order to accomplish its goal of increasing its presence on the CBOE floor, Geldermann announced that it was going to employ the personnel of Star Clearing who have agreed to close their firm and join Geldermann, Inc. The primary organizational structure was to include their personnel who "are extremely experienced in marker trading, market maker management, and securities and options clearing."

Plaintiff testified that he did not know of the December 24, 1986, contract until after it was executed and:

> "[I]t was February of 1987 when I found out here's all the company and *** I was not allowed to go there. I went to the office one Sunday, and I retrieved all these documents from the office, and I copied, and then I called my attorney on that matter."

Geldermann personnel demanded return of the books because they could not do business without them. After returning the books, plaintiff continued to protest the actions taken by Geldermann and threatened to institute a suit.

On February 2, 1987, Geldermann signed indemnification letters concerning two seats owned and leased out by plaintiff under the name of "GNM Partners." GNM Partners was a CBOE member of which plaintiff was the general partner. One of the seats had been leased to Ronald Dim on December 10, 1986, and the other to "CRYJNO partnership/John F. Martorello" on February 2, 1987. These seats were used in the business which plaintiff later claimed was wrongfully converted.

Sometime after February 6, 1987, a check for $570,000 from Star Clearing was forwarded to plaintiff which bore an inscription on the back "OK per Patricia Pokuta of Geldermann Securities." Through March 1987, plaintiff received $627,000, $605,000 of which was for loan repayments plus an additional $22,000 above that.

transfer of ownership is required; the assets of Star were transferred in exchange for guaranteed draws to [James] Stathis for a specific period of time."

On September 16, 1987, plaintiff filed a complaint against Geldermann, Inc., GSI, Star Clearing, James, and Martorello. Count I charged Geldermann and GSI with conversion of plaintiff's property, including profits. Count II charged Geldermann, GSI, James, and Martorello with diversion of corporate opportunity and conspiracy of conduct by Geldermann and GSI in assisting the diversion for the purposes of unlawfully obtaining the assets and business of Star. During the litigation, James and Martorello were dismissed with prejudice.

In February 1988, James and Martorello, while still defendants in this litigation, initiated an arbitration proceeding against Geldermann before the CBOE relating to the December 24, 1986, agreement. Geldermann filed a counterclaim against James and Martorello for fraud and breach of contract.

Thereafter, on April 17, 1989, plaintiff filed, before the circuit court, an emergency petition to impress a constructive trust lien of the arbitration award among defendants of a related claim, and to appoint a trustee of said funds. Plaintiff's motion requested that any award or settlement arising from the CBOE arbitration (which was still ongoing at that date) be held in trust by a court-appointed trustee until judgment was entered or any other resolution reached in this circuit court litigation.

On August 29, 1989, a panel of CBOE arbitrators entered an award requiring Geldermann to pay James and Martorello $359,287. On September 8, 1989, Geldermann filed an interpleader action in the circuit court of Cook County naming various alleged creditors of James and Martorello, including instant plaintiff, as well as James' and Martorello's attorneys, as defendants. Geldermann then deposited $359,287 with the clerk of the circuit court.

Instant plaintiff then entered into a settlement agreement with the other defendants in the interpleader action accepting $30,000 as a complete settlement of his claim to the fund generated by the arbitration award.

On February 7, 1991, Geldermann filed a motion for summary judgment and a motion to stay discovery pending resolution of the summary judgment motion. After briefing and argument, the circuit court considered plaintiff's amended Supreme Court Rule 191(b) (134 Ill. 2d R. 191(b)) affidavit setting forth the need for six depositions, but allowed three.

On April 3, 1992, the circuit court rendered a memorandum opinion and order granting summary judgment in favor of Geldermann, finding that (1) the depositions and documents unequivocally indicate that James Stathis had actual authority from plaintiff to sell

the assets of Star Clearing, which was supported by the April 11, 1986, letter; (2) the actual authority negated the conversion count and supported Geldermann's defense of ratification by plaintiff's silence; and (3) plaintiff had failed to prove that unauthorized conduct on the part of Geldermann existed. The circuit court rejected James' affidavit filed in opposition to the summary judgment motion, on the ground that his testimony at the arbitration hearing contradicted the affidavit. Plaintiff appeals.

I

Plaintiff initially contends that the facts, together with the inferences to be drawn therefrom, when viewed most favorably to plaintiff, dictate that summary judgment was improperly entered in favor of Geldermann.

■ First, plaintiff asserts that this is a classic case of conversion. A party claiming conversion must show (1) an unauthorized and wrongful assumption of control, domination, or ownership by a person over the personalty of another; (2) a right in the property; (3) a right to the immediate possession of the property, absolute and unconditional; and (4) a demand for possession thereof (*Glaser v. Kazak* (1988), 173 Ill. App. 3d 108, 115, 527 N.E.2d 379); however, a demand is unnecessary to establish a conversion where some other independent act of conversion can be shown. *Jensen v. Chicago & Western Indiana R.R. Co.* (1981), 94 Ill. App. 3d 915, 933, 419 N.E.2d 578.

Plaintiff asserts that Geldermann knew he was the owner of Star Clearing; that all the capital was contributed by him; that plaintiff's capital had to be returned to him from any deal made; that a unanimous vote of the voting partners was required to do any act which would materially affect the business or assets of the partnership, including a sale or disposal of its assets; that Geldermann knew it had to contribute enough capital to cash plaintiff out; and that Geldermann admitted, for the purpose of its motion, that it took possession of the assets and business of Star Clearing after it executed the December 24, 1986, agreement, which was characterized by Geldermann employees as an employment agreement hiring James. Plaintiff argues further that Geldermann admitted that it had no knowledge of and did not rely upon the April 11, 1986, letter written by plaintiff to James, and Geldermann was not a party to nor did it have knowledge of the alleged November 1986 conversation between plaintiff and James, which, according to the circuit court, constituted actual authority for Geldermann to take plaintiff's property.

Geldermann maintains that the circuit court correctly found that plaintiff authorized the transfer of Star Clearing's assets; therefore,

none of the facts or inferences create a genuine issue of material fact with respect to the existence of unauthorized conduct. Accordingly, it is alleged, summary judgment was proper. Moreover, Geldermann asserts that there was no conversion because there was no demand and no independent act which would excuse the lack of a demand. See *Jensen*, 94 Ill. App. 3d at 933.

The record reveals that Geldermann, through its negotiators, had no knowledge of the April 11, 1986, letter written by plaintiff to James, nor of any ensuing conversations thereafter between the two men relative to the sale of Star Clearing. Geldermann's representatives were told by James that plaintiff's investment would have to be replaced. Geldermann's negotiators knew that James was only the manager of Star Clearing; they did not inquire as to the ownership of the business although by December 1986 Geldermann's chief financial officer was made privy to the Star Clearing partnership agreement. The December 24, 1986, agreement between James and Geldermann, characterized by the circuit court as a "buy-out or asset sale," was sent to James' residence, not to the offices of Star Clearing, where the latter was still doing business. Finally, the record shows that plaintiff was not a party to the December 24 agreement.

■ The acts of an agent beyond the scope of his authority cannot be imputed to his principal. (*Thomas v. Frederick J. Borgsmiller, Inc.* (1987), 155 Ill. App. 3d 1057, 1060-61, 508 N.E.2d 1235.) Geldermann was required to show that it knew the facts constituting the alleged agency; that it had a good-faith belief that James possessed the authority to sell the business; and that it relied on James' authority to its detriment. (See *Northern Trust Co. v. St. Francis Hospital* (1988), 168 Ill. App. 3d 270, 278, 522 N.E.2d 699.) The facts adduced thus far, and reasonable inferences drawn therefrom, do not support Geldermann's claims of agency and detrimental reliance as a matter of law. Summary judgment in Geldermann's favor was improvidently granted and must be reversed.

Plaintiff asserts that the circuit court erroneously disregarded James' affidavit in opposition to Geldermann's motion for summary judgment and based its ruling on James' testimony given at an arbitration hearing for breach of the employment agreement with Geldermann.

The circuit court stated that at the arbitration proceeding James testified that

> "he and Martorello bought out plaintiff's interest in Star the day prior to the execution of the December Employment Agreement, and indicated that his father was in agreement with the buy out or asset sale to Geldermann, that Stathis reviewed the agreement

in December, and was only concerned with when he would get his money out."

The court found that "[t]his sworn testimony contradicts the statements [p]laintiff relies on in [James'] affidavit." The court cited *Smith v. Ashley* (1975), 29 Ill. App. 3d 932, 332 N.E.2d 32, where a party's affidavit was rejected because it contradicted prior deposition testimony. The rejection was an expression of judicial policy to eliminate the temptation to commit perjury. Any contradiction in James' testimony, however, serves only to highlight the need for a trial on its merits in this case.

## II

■ Plaintiff maintains that the circuit court erred in finding that he ratified by silence Geldermann's acts. Specifically, plaintiff contends that the presence of genuine issues of fact prevented the circuit court from concluding that he ratified the agreement between James and Geldermann.

Plaintiff testified that he did not know of the execution of the employment contract until it was already done and that Star Clearing did not render a final accounting statement until after February 6, 1987. Furthermore, he disputes the circuit court's implication that he continued to do business with Geldermann by leasing seats. Plaintiff asserts that he was: completely disenfranchised from his business interest; in a complete quandary about the status of his $1,090,000 investment in that business; not privy to the deal Geldermann had made concerning the takeover of Star Clearing's operations which locked him out; and prior to that time, operated under the belief that he would receive the return of his entire investment plus $100,000 from any deal struck between Geldermann and Star Clearing. Plaintiff adds that he accepted the funds given to him in what appeared to be a forthcoming flow of full payment. Furthermore, plaintiff maintains, he did not sit on his rights, but went to his attorney immediately after being excluded from Star Clearing's premises, which was when he removed and copied documents from the office.

Ratification takes place when the principal with knowledge of the material facts regarding an unauthorized transaction takes a position inconsistent with nonaffirmation of the transaction; another means of ratification occurs where the principal retains the benefit of the transaction. *Williams v. Magnafici* (1979), 77 Ill. App. 3d 1035, 1038, 397 N.E.2d 197.

Geldermann argues that ratification or waiver exists because plaintiff authorized James to negotiate a deal with Geldermann and

stated that he was obligated to accept the deal; plaintiff entered into an agreement with James to do as he wanted with Star Clearing in exchange for $1,190,000; plaintiff accepted checks for over $600,000 from James; plaintiff entered into two contracts with Geldermann to lease membership seats; and, finally, plaintiff allegedly failed to challenge the December 24, 1986, agreement until September 1987 when the complaint was filed.

Plaintiff responds that his alleged authorization refers to the April 11 letter of which Geldermann had no knowledge, on which Geldermann could not and did not rely, and in which it was stated that the deal "would be beneficial to all" concerned. Plaintiff avers that the asserted agreement between him and James is susceptible to strong inferences contrary to the suggestion that he could do as he pleases with the business. As to plaintiff's acceptance of the checks, he declares it was proper as in line with his expectations and as necessary to mitigate his damages. The leasing contracts for CBOE seats entered into were made by plaintiff in his capacity other than that as owner of Star Clearing, were not made with Geldermann, and were cancelled when plaintiff first asserted his right of possession. Finally, plaintiff urges that he did not wait until September to challenge the agreement.

Ordinarily, ratification is a question of fact to be decided at trial, particularly where, as here, reasonable persons can draw differing inferences or conclusions from them. *Smart Data, Inc. v. United Parcel Service, Inc.* (1990), 195 Ill. App. 3d 779, 782-84, 552 N.E.2d 1089; *Hofner v. Glenn Ingram & Co.* (1985), 140 Ill. App. 3d 874, 883, 489 N.E.2d 311; *Johnson v. North Bank* (1981), 99 Ill. App. 3d 320, 323, 426 N.E.2d 4.

It is clear from the evidence presented that reasonable inferences may be drawn contrary to the circuit court's conclusion as a matter of law that plaintiff ratified or waived the acts of James in his dealings with Geldermann.

### III

■ Lastly, plaintiff submits that the facts present a jury question as to conspiracy conduct in diverting a corporate opportunity.

Count II of the complaint charges the diversion of a corporate opportunity by James and Martorello. The complaint further charges that Geldermann and GSI knew that neither James nor Martorello had authority to turn over the business and assets of Star Clearing. Paragraph 18 of Count II states that

> "[r]ather than dutifully negotiate with Geldermann on behalf of the voting partner each negotiated for himself. Despite [Gelder-

mann's] knowledge of [plaintiff's] interest in Star, said negotiations resulted in Geldermann's assuming control of the business and assets of Star in return for a partnership interest in GSI for James Stathis."

Paragraph 24 concluded that

"[t]he foregoing conduct on the part of Geldermann and GSI constitutes conspiracy conduct to assist James Stathis and John Martorello in diverting said corporate opportunity for the purpose of unlawfully obtaining the assets and business of Star."

An officer owes a fiduciary duty of loyalty to his employer; this duty includes the obligation to disavow any business opportunity where the officer's private interest would conflict with those of the enterprise. (*Comedy Cottage, Inc. v. Berk* (1986), 145 Ill. App. 3d 355, 359, 495 N.E.2d 1006.) The business opportunity doctrine prohibits an officer from taking advantage of business opportunities which are considered as belonging to the enterprise, as far as the fiduciary is concerned. A business opportunity exists when a proposed activity is reasonably incident to the entity's present or prospective business and is one in which it has the capacity to engage. *Lindenhurst Drugs, Inc. v. Becker* (1987), 154 Ill. App. 3d 61, 67, 506 N.E.2d 645; see also 68 C.J.S. *Partnership* § 106 (1950).

Plaintiff argues that the evidence connected Geldermann directly with the corporate manager who was an officer in the corporation owned by plaintiff which in turn owned Star Clearing. Plaintiff adds that it was Geldermann which presented the corporate opportunity, found a way to acquire it without paying for it, and did so by conspiring and acting in concert with the manager who owned a fiduciary duty to plaintiff, which was allegedly well known to Geldermann.

Geldermann responds that plaintiff failed to show the existence of unauthorized conduct. It is asserted that plaintiff consented and that there is no genuine issue of material fact with respect to the existence of unauthorized conduct. As with the evidence relating to conversion, there is a genuine issue of material fact here requiring trial.

For these reasons, the judgment must be reversed and the cause remanded for trial.

Reversed and remanded.

DiVITO, P.J., and McCORMICK, J., concur.