**In re OSTROM–MARTIN, INC., Debtor.**

**Richard E. BARBER, Chapter 7 Trustee for Ostrom–Martin, Inc., Plaintiff,**

v.

**FIRST NATIONAL BANK OF CHILLICOTHE and Princeville State Bank, Defendants.**

Bankruptcy No. 92–80099.
Adv. No. 92–8164.

United States Bankruptcy Court, C.D. Illinois.

Oct. 12, 1995.

248

Duncan G. Harris, Schiff, Hardin & Waite, Chicago, IL Michael T. Mahoney, Chillicothe, IL, First National Bank of Chillicothe.

Barry M. Barash, Barash, Stoerzbach & Henson, Galesburg, IL, for Plaintiff.

Richard E. Barber, Chapter 7 Trustee, Galesburg, IL.

Gregg N. Grimsley, Vonachen, Lawless, Trager & Slevin, Peoria, IL, for Princeville State Bank.

## OPINION

WILLIAM V. ALTENBERGER, Chief Judge.

In late December, 1991, Ostrom–Martin, Inc. (OMI), a grain company with several facilities in neighboring communities failed, and in early 1992 an involuntary petition under Chapter 7 of the Bankruptcy Code was filed against it. This adversary proceeding, brought by the Chapter 7 Trustee against the FIRST NATIONAL BANK OF CHILLICOTHE (CHILLICOTHE BANK) and the PRINCEVILLE STATE BANK (PRINCEVILLE BANK), to establish their liability for honoring a check with a forged endorsement, centers upon the actions of Kevin Martin, a director, shareholder and president of OMI, in his attempt to keep OMI afloat. Kevin Martin and other members of his extended family, were involved in several related entities. The related entities involved with this litigation are summarized below.[1]

OMI:

OMI's officers, directors, and stockholders are:

| | | | |
|---|---|---|---|
| 1. | Kevin E. Martin | Stockholder, President & Director | 20% Stockholder |
| 2. | Gerald Martin | Stockholder, Vice–Pres. & Director | 20% Stockholder |
| 3. | Ellsworth Martin | Stockholder, Vice–Pres. & Director | 10% Stockholder |
| 4. | Donna Martin | Stockholder | 10% Stockholder |
| 5. | Kenneth Martin | Stockholder, Sec'y– Treas. & Director | 20% Stockholder |
| 6. | Ervin Martin | Stockholder | 20% Stockholder |
| 7. | Lorane Martin | Director | None |

[1] The summation of the "Martin Entities" is taken from the settlement agreement entered into between Richard Barber as Trustee for OMI and Rumbold & Kuhn, Inc. and Bruce Graham, in an adversary proceeding brought by the Trustee against them which was filed in this adversary as an attachment to the response filed by Elwin Rumbold on June 13, 1994, to the Trustee's motion to compel discovery and for sanctions.

**Martin Farms of Princeville, Inc. (MFP):**

MFP's officers, directors, and stockholders are:

| | | | |
|---|---|---|---|
| 1. | Kevin E. Martin | Stockholder, Sec./Treas. & Director | 20% Stockholder |
| 2. | Ellsworth Martin | Stockholder, President & Director | 20% Stockholder |
| 3. | Gerald E. Martin | Stockholder, Vice–Pres. & Director | 20% Stockholder |
| 4. | Kenneth L. Martin | Stockholder, Vice–Pres. & Director | 20% Stockholder |
| 5. | Ervin E. Martin | Stockholder | 20% Stockholder |

**Martin Fertilizer**: trade name of Martin Farms of Princeville, Inc.

---

Each year OMI was required to renew its grain dealer licenses issued by the Illinois Department of Agriculture (DEPARTMENT). 225 ILCS 630/4. The application for renewal was due within 90 days after the close of the fiscal year, which, for OMI was the end of November. 225 ILCS 630/2. Upon application, the DEPARTMENT could extend the time for filing the application an additional sixty days. For grain dealers like OMI, the application had to be accompanied by a financial statement, approved or certified by a licensed independent public accountant. One of the requirements which must be satisfied in order to have a license renewed is referred to as a one-to-one working capital ratio. Section 4(e)(1) of the Grain Dealers Act provides:

The applicant or licensee's financial statement and balance sheet show a current ratio of the total adjusted current assets to the total adjusted current liabilities of at least one to one. Adjusted current assets shall be calculated by deducting from the stated current assets shown on the balance sheet submitted by the applicant or licensee any non-liquid current asset including, but not limited to, notes receivable from officers or stockholders, accounts receivable from officers or stockholders, stock subscriptions receivable, intra-company receivables or receivables from an affiliate or any other related party receivables. Any disallowed asset shall be netted against any related liability and the net result, if an asset, shall be subtracted from the current assets, or if a liability, it shall remain an adjusted current liability.

225 ILCS 630/4(e)(1).

According to the deposition of Laura Ehnle (EHNLE), OMI's bookkeeper, monies had been transferred back and forth between the Martin entities for many years. EHNLE kept separate ledgers, showing the interentity transfers and balances due. The following summarizes the transfers between OMI and MFP, beginning with stated balances due OMI on December 31, 1990, March 31, 1991, and June 30, 1991, and itemizing all transactions thereafter through the end of the fiscal year:

| DATE | OMI to MFP | MFP to OMI | $ DUE MFP | $ DUE OMI |
|---|---|---|---|---|
| 12–31–90 | | | | $ 1,230,000 |
| 3–31–91 | | | | 320,000 |
| 6–30–91 | | | | 322,000 |
| 7–5–91 | | $ 7,000 | | 315,000 |
| 7–8–91 | | 190,600 | | 124,400 |
| 7–10–91 | $23,000 | | | 147,400 |
| 7–11–91 | 18,000 | | | 165,400 |
| 7–25–91 | 45,000 | | | 210,400 |
| 7–23–91 | 160,000 | | | 370,400 |
| 7–29–91 | | 150,000 | | 220,400 |
| 8–30–91 | 83,975.89 | | | 304,375.89 |

On August 31, 1991, the end of the fiscal year, MFP paid OMI $304,375.89. As was later discovered by the accountants, however, at the time the transfer was made, MFP did not have the cash balance necessary to make the payment. The initial internal balance

sheet prepared for MFP for the fiscal year ending August 31, 1991, reflects shareholder loans of $605,000 having been made prior to August 31, 1991, which, if accurate, would have enabled MFP to make the payment to OMI. Those loans were never in fact made.

On September 3, 1991, Kevin Martin had two large checks issued. One check was payable to Rumbold and Kuhn, a grain company owned by Elwin Rumbold and his family, in the amount of $300,000, and was delivered to Rumbold and Kuhn by Ervin and Lorane Martin. OMI executed a promissory note to Rumbold and Kuhn. On that same date, Rumbold and Kuhn loaned MFP $305,000. After the bankruptcy, the Trustee sued Rumbold and Kuhn and the case was later settled, with the Trustee recovering $300,000.

The second large check, which is the subject of this adversary proceeding, was issued on that same date and was made payable to Rumbold Valley Farms, a farming entity, also owned by Elwin Rumbold and his family, in the amount of $300,000. At Kevin Martin's direction, EHNLE logged the check on OMI's records as a loan to Rumbold Valley Farms. The next day, Kevin Martin placed an endorsement on the reverse side of the check "Pay to the order of Martin Farms, Inc." Beneath the endorsement, Kevin Martin added the words "Rumbold Valley Farms" and signed "Elwin Rumbold." Kevin Martin deposited the check in the MFP account at the CHILLICOTHE BANK. The CHILLICOTHE BANK accepted the check for deposit and credited the account of MFP. The PRINCEVILLE BANK paid the check when it was presented by the CHILLICOTHE BANK.

Sometime later, when the cancelled check was returned to OMI, Kevin Martin obliterated the words "Rumbold Valley" on the face of OMI's check and substituted the word "Martin" thereon so that the payee was shown as "Martin Farms". On the reverse side of the check, Kevin Martin obliterated the endorsement along with the forged signature of Elwin Rumbold. On the returned deposit slip used by MFP to deposit the check at the CHILLICOTHE BANK, Kevin Martin obliterated the words "Rumbold Valley Farms" and substituted "OMI" in their

place. To complete the switch, according to EHNLE's deposition testimony, in November or December of 1991, at Kevin Martin's direction, OMI's books were changed to reflect that the payee of the check was MFP rather than Rumbold Valley Farms.

With time running out, and unable to meet the one-to-one ratio required to renew the grain dealer's license, Kevin Martin confessed his misrepresentations to the accountants and the Illinois Department of Agriculture, and OMI surrendered its grain dealer's license on December 30, 1991, with its operations being taken over by the Department of Agriculture. An involuntary petition was filed against OMI on January 14, 1992, and an order for relief was later entered.

The Chapter 7 Trustee brought this adversary proceeding against both the CHILLICOTHE BANK and the PRINCEVILLE BANK to recover on the forged endorsement. This Court has issued a previous ruling in this adversary proceeding, denying both the BANKS' motions to dismiss and the Trustee's motion for judgment on the pleadings, finding that the parties had raised questions of fact. Because the legal issues had not been adequately briefed and discovery had not been completed, this Court determined that any resolution of the case at that point would be premature. This Court did rule that the applicable § 3–404 and § 3–405 of the Uniform Commercial Code (UCC), Ill.Rev.Stat.1991, ch. 26, ¶ 3–404 and ¶ 3–405, providing for the "fictitious payee rule" were those in effect prior to their amendment effective January 1, 1992. *In re Ostrom–Martin, Inc.*, 155 B.R.997 (Bkrtcy.C.D.Ill. 1993).

Kevin Martin, the key witness in this proceeding, asserted his fifth amendment privilege against self-incrimination during his deposition. After an in camera hearing, Judge Larry Lessen, a fellow Bankruptcy Judge for the Central District of Illinois, found that Kevin Martin has reasonable cause to believe that any or all of the answers to certain questions might be used against him in a criminal prosecution, and his testimonial privilege was sustained.

After completing discovery, both the CHILLICOTHE BANK and the PRINCE-

VILLE BANK filed motions for summary judgment which were heard on May 22, 1995. The CHILLICOTHE BANK contends that it has a number of complete defenses to the Trustee's complaint, including the "fictitious payee rule" and ratification by OMI. The CHILLICOTHE BANK also claims that MFP repaid OMI $295,000 of the $300,000 and that the Trustee's claim of damages is limited to $5,000. Finally, the CHILLICOTHE BANK argues that it is entitled to judgment as a matter of law because the Trustee cannot bring a direct action against it, but must sue the PRINCEVILLE BANK. In response, the Trustee denies that the "fictitious payee rule" is applicable or that the forgery was ratified, and that the monies were repaid. The Trustee also contends that the CHILLICOTHE BANK cannot escape liability because it was negligent in accepting the check in that it should have had a "large check" policy. While setting forth several grounds why it is not liable to the Trustee, the PRINCEVILLE BANK argues that any liability it may ultimately be determined to have to the Trustee it can pass on to the CHILLICOTHE BANK under § 3–417 and § 4–207 of the UCC. 810 ILCS 5/3–417 and 4–207.

There is a preliminary observation that cannot be disregarded, which is the status occupied by the Trustee in this proceeding. Section 323(b) of the Bankruptcy Code gives the trustee the right to prosecute causes of action belonging to the estate. 11 U.S.C. § 323(b). Such actions fall into two categories: those brought by the trustee as successor to the debtor's interest in the estate; and those brought under the trustee's avoiding powers. 2 *Collier on Bankruptcy*, ¶ 323.02[4]. p. 323–10. Under the first group, the trustee stands in the shoes of the debtor and may only institute whatever actions the debtor could have brought itself and is subject to the same defenses as could have been asserted by the defendant had the action been brought by the debtor. *Yale II Mining Assocs. v. Gilliam*, 586 F.Supp. 893 (W.D.Va.1984); *In re Ahead by a Length*, 100 B.R. 157 (Bkrtcy.S.D.N.Y.1989). It is only when the trustee is exercising his avoiding powers that he accedes to a superior status and possesses extraordinary rights.

The present case is not brought under the Trustee's avoiding powers, but rather the Trustee is proceeding in the shoes of OMI, and he may not prevail, if OMI would itself have failed.

Prior to addressing the specific legal arguments raised by the BANKS, a general statement of the applicable law is appropriate. As a general rule, a depositary or drawee bank which pays over a forged endorsement is liable unless an exception to the general rule is applicable. Exceptions to the general rule involve the "fictitious payee" rule, ratification, substantial negligence on the part of the drawer, or that no loss resulted. In the context of this case there was a forged endorsement and the banks are liable unless they can bring themselves within one of the exceptions.

Turning first to the motion for summary judgment filed by the PRINCEVILLE BANK, under § 4–401(a) of the UCC a bank may only charge an item against the customer's account which is "properly payable." 810 ILCS 5/4–401(a); *National Bank of Monticello v. Quinn*, 126 Ill.2d 129, 533 N.E.2d 846, 127 Ill.Dec. 764 (1989). A drawee bank is strictly liable to the drawer for the amount of an improper payment, such as the payment of a check over an unauthorized signature of the payee. Under § 4–401(a) of the UCC the PRINCEVILLE BANK is liable unless it can bring itself within the scope of one of the exceptions. In its motion for summary judgment the PRINCEVILLE BANK contends that it is not liable to the Trustee based upon § 3–419 or § 3–420 of the UCC. 810 ILCS 5/3–419 and 3–420. Section 3–419 was amended and renumbered as § 3–420. The PRINCEVILLE BANK merely cites both sections without indicating which is applicable. In this Court's view, for the reasons set forth in its earlier opinion, it is the earlier version found in § 3–419 which is applicable to this case. Regardless of whether § 3–419 or § 3–420 is applicable, the PRINCEVILLE BANK's reliance on those sections is misplaced.

Section 3–419, or revised and renumbered § 3–420, provide the true owner with a

cause of action for conversion against a party paying the check over a forged or unauthorized endorsement. But the right to sue under either of those sections is limited to the "true owner" of the check. In this case, assuming Rumbold Valley Farms was the true owner, Rumbold Valley Farms could sue under § 3–419 or § 3–420 for conversion. However, OMI's rights are based on § 4–401(a) and not § 3–419 or § 3–420. The UCC Comments to § 3–420, address this point. Comment 1, provides in part:

> Under former Article 3, the cases were divided on the issue of whether the drawer of a check with a forged indorsement can assert rights against a depositary bank that took the check. The last sentence of Section 3–420(a) resolves the conflict by following the rule stated in *Stone & Webster Engineering Corp. v. First National Bank & Trust Co.* [345 Mass. 1], 184 N.E.2d 358 (1962). There is no reason why a drawer should have an action in conversion. The check represents an obligation of the drawer rather than property of the drawer. The drawer has an adequate remedy against the payor bank for recredit of the drawer's account for unauthorized payment of the check.
>
> . . . .
>
> The drawer of the check has no conversion remedy, but the drawee is not entitled to charge the drawer's account when the drawee wrongfully honored the check. The remedy of the drawee is against the depositary bank for breach of warranty under Section 3–417(a)(1) or 4–208(a)(1). The loss will fall on the person who gave value to the thief for the check.[2]

▪ The PRINCEVILLE BANK also relies upon § 4–406 of the UCC which imposes a duty upon a bank customer to examine his bank statements and discover any unauthorized indorsements or alterations and notify the bank within the one year time period. That section provides:

> (1) When a bank sends to its customer a statement of account accompanied by items paid in good faith in support of the debit entries or holds the statement and items pursuant to a request or instructions of its customer or otherwise in a reasonable manner makes the statement and items available to the customer, the customer must exercise reasonable care and promptness to examine the statement and items to discover his unauthorized signature or any alteration on an item and must notify the bank promptly after discovery thereof.
>
> (2) If the bank establishes that the customer failed with respect to an item to comply with the duties imposed on the customer by subsection (1) the customer is precluded from asserting against the bank
>
> (a) his unauthorized signature or any alteration on the item if the bank also establishes that it suffered a loss by reason of such failure; and
>
> (b) an unauthorized signature or alteration by the same wrongdoer on any other item paid in good faith by the bank after the first item and statement was available to the customer for a reasonable period not exceeding 14 calendar days and before the bank receives notification from the customer of any such unauthorized signature or alteration.
>
> (3) The preclusion under subsection (2) does not apply if the customer establishes lack of ordinary care on the part of the bank in paying the item(s).
>
> (4) Without regard to care or lack of care of either the customer or the bank a customer who does not within one year from the time the statement and items are made available to the customer (subsection (1)) discover and report his unauthorized signature or any alteration on the face or back of the item or does not within 3 years from that time discover and report any unauthorized indorsement is precluded from asserting against the bank such unauthorized signature or indorsement or such alteration.
>
> (5) If under this Section a payor bank has a valid defense against a claim of a customer upon or resulting from payment

---

**2.** It is in fact those latter two sections upon which the PRINCEVILLE BANK relies to shift any liability it may have to the CHILLICOTHE BANK.

of an item and waives or fails upon request to assert the defense the bank may not assert against any collecting bank or other prior party presenting or transferring the item a claim based upon the unauthorized signature or alteration giving rise to the customer's claim.

810 ILCS 5/4–406. Contending that it had no notice of the improper payment of the check prior to September, 1992, PRINCE-VILLE BANK asserts that OMI failed to promptly notify it of the forgery.

PRINCEVILLE BANK misconstrues § 4–406. Under § 4–406(1), the drawer must exercise reasonable care and promptness to examine the bank statement to discover "his unauthorized signature" or "any alteration" on an item. Under § 4–406(4) the drawer must within one year discover and report to the drawee any unauthorized signature or any alteration, or within three years discover and report to the drawee any unauthorized endorsement. If the drawer fails to do so, the drawer is precluded from asserting an unauthorized signature or endorsement or alteration. Section 4–406 makes a distinction between an unauthorized signature or alteration and an unauthorized endorsement. In the case before this Court there was no forged signature on the check at issue here and the check was altered some time after it was returned to OMI, perhaps after it was properly examined by the bookkeeper. The payment of the check was improper because of the forged endorsement and the subsequent alteration by Kevin Martin has no bearing upon the application of the one year time limit imposed by § 4–406. The applicable time limit under § 4–406(4) is a three year time period for asserting the forgery of a payee's endorsement.[3] The Trustee's action was brought well within that time frame.

■ Turning to the motion for summary judgment filed by the CHILLICOTHE BANK, it contends that the "fictitious payee rule" defeats the Trustee's cause of action. Arguing that summary judgment is improper, the Trustee asserts that disputed issues of material fact exist. A focal point of dispute since the onset of this case was the applicability of the "fictitious payee rule" and the question whether Kevin Martin intended Rumbold Valley Farms to have an interest in the check when it was written. Under § 3–405 of the UCC, as it then provided, a forged endorsement is effective if the person signing on behalf of the drawer "intends the payee to have no interest in the instrument." The Trustee concedes that if the rule applies, this action will fail, but contends there is a question of fact as to whether Kevin Martin intended Rumbold Valley Farms to have an interest in the check at the moment it was drawn. At the present time, and as long as Kevin Martin remains shrouded in silence,[4] the exact reason for making the check payable to Rumbold Valley Farms and the path it took from Kevin Martin's hands to the CHILLICOTHE BANK are unknown. His true intent presents a disputed question of material fact which cannot be resolved on a motion for summary judgment. While the CHILLICOTHE BANK argues that the check was not part of a bona fide transaction and served no legitimate business purpose, a check drawn that same day payable to Rumbold and Kuhn, an entity related to Rumbold Valley Farms, did create a valid and enforce-

---

3. This section of the UCC was also amended by P.A.87–582, effective January 1, 1992. Subsection (c) of § 4–406 now provides:

> If a bank sends or makes available a statement of account or items pursuant to subsection (a), the customer must exercise reasonable promptness in examining the statement or the items to determine whether any payment was not authorized because of an alteration of an item or because a purported signature by or on behalf of the customer was not authorized. If, based on the statement or items provided, the customer should reasonably have discovered the unauthorized payment, the customer must promptly notify the bank of the relevant facts.

810 ILCS 5/4–406(c). In discussing the changes to § 4–406(4), the UCC Comment No. 5 states, in pertinent part:

> [T]he reference in former subsection (4) to unauthorized indorsements is deleted. Section 4–406 imposes no duties on the drawer to look for unauthorized indorsements. Section 4–111 sets out a statute of limitations allowing a customer a three-year period to seek a credit to an account improperly charged by payment of an item bearing an unauthorized indorsement.

4. As of the date of this opinion, Kevin Martin has yet to be indicted but remains subject to prosecution.

able obligation between that entity and OMI and the Trustee later recovered that amount for the benefit of creditors. The denials by representatives of Rumbold Valley Farms of their knowledge or agreement to accept the check from Kevin Martin play no role in determining what Kevin Martin intended when the check was written. This Court declines, at this point, to expand the fictitious payee rule beyond the confines of the statute, as urged by the CHILLICOTHE BANK.

The PRINCEVILLE BANK also contends, along with the CHILLICOTHE BANK, that OMI ratified the actions of Kevin Martin with regard to the forged check. Here, too, the Trustee contends there is a question of fact as to whether OMI ratified Kevin Martin's diversion of the check from Rumbold Valley Farms to MFP. Under § 3–404 of the UCC, an unauthorized signature may be ratified for all purposes. Ratification may be express or implied and occurs when the principal, with full knowledge of the material facts, takes a position which is inconsistent with any other position than intent to adopt the act, or where the principal retains the benefits. *Stathis v. Geldermann, Inc.,* 258 Ill.App.3d 690, 630 N.E.2d 926, 196 Ill.Dec. 761 (1st Dist.1994). Ratification and authorization are ordinarily questions of fact properly determined after a trial. *Johnson v. North Bank,* 99 Ill.App.3d 320, 55 Ill.Dec. 220, 426 N.E.2d 4 (Callaghan) 1514 (1st Dist. 1981).

The BANKS argue that OMI ratified Kevin Martin's activity with regard to the forged check when Kevin Martin changed the books to reflect that the proceeds of the check went to MFP. The check was written on September 3, 1991, and EHNLE testified in her deposition that Kevin Martin directed her to correct the books in November or December of that year. OMI surrendered its grain license on December 31, 1991, and the Illinois Department of Agriculture took over its grain operations on that date. While EHNLE testified that she had advised some of the other OMI directors of instances of Kevin Martin's alleged improprieties, she did not testify that she advised the other directors of his activities with regard to this specific check. While it is true that EHNLE testified that Kevin Martin "ran the show," whether his actions alone may constitute a ratification by OMI also presents a factual question which cannot be determined on the record before this Court. The record discloses that the companion check issued to Rumbold and Kuhn was delivered to that entity by Kevin Martin's father, who was also a director of OMI. As the court noted in *Johnson v. North Bank, supra,* a party's right to summary judgment must be free from doubt and where doubt exists, it is better judicial policy to permit the matter to be determined after a trial.

That is not to be taken as any indication that the Trustee will ultimately prevail. Among the defenses available to a bank in an action by a drawer to recover for improper payment of a check is the "intended payee" defense. In *Ambassador Financial Services, Inc. v. Indiana National Bank,* 605 N.E.2d 746 (1992), the court examined the "intended payee" defense in detail, stating:

> Recognizing that not all improper payments cause a loss which should be actionable, the Indiana legislature and courts have established several statutory and equitable defenses for a bank which pays a check over the forged endorsement of a payee. Under [UCC § 3–404], for example, an otherwise invalid endorsement may become operative as the named person's signature if that person ratifies the signature or is precluded by estoppel from denying it. The "fictitious payee" defense, codified at [§ 3–405], similarly allows a drawee bank to escape from its liability for improperly paying a check bearing the forged endorsement of a payee. Under that defense, an endorsement by any person in the name of a named payee is deemed effective if an imposter has induced the drawer to issue the check to him in the name of the payee.

> Apart from the statutory defenses to liability expressly provided by the U.C.C., certain equitable defenses exist to reduce or eliminate a drawee bank's liability for payment of a check bearing the forged endorsement of a payee. [*See* UCC § 1–103 ("Unless displaced by the particular

provisions of the UCC, the principles of law and equity ... shall supplement the provisions of the UCC) ]. Separate from, but closely associated with, the intended payee defense is the defense of mitigation of damages for a drawee or collecting bank defending a conversion action brought pursuant to [§ 3–419] by a payee whose endorsement was forged or missing. The mitigation of damages defense reduces the bank's liability to the extent the proceeds of the check were received by the payee and applied to the specific debt to which the payee intended they apply. [Citation.]

The mitigation of damages defense is aimed at preventing unjust enrichment, and it exists to prevent a payee from recovering on a forged endorsement to the extent the payee did not suffer damages in the transaction. A defendant seeking the benefit of the defense must show that the check proceeds were applied as the payee intended because otherwise the defense would have "the effect of allowing the tortfeasor to dictate to the true owner how his property is to be used." [Citation.]

The intended payee defense is similarly aimed at preventing a drawer from being unjustly enriched by recovering for an improperly paid check when the proceeds of the check in fact were received by the payee intended by the drawer and the drawer suffered no damages caused by the improper payment. The Appellate Court of Indiana applied this defense as long ago as 1937, *Shank v. Peoples State Bank*, [ (1937) 104 Ind.App. [443] at 458–59, 7 N.E.2d [46] at 52 [ (1937) ], and some say it has attained "universal recognition," *Commercial Credit Corp. v. Empire Trust Co.*, 260 F.2d 132, 134 (8th Cir.1958). The defense "is based on the view that the drawer should not be permitted to recover from the drawee bank where he has suffered no loss from the improper payment of a check." (Citation). The intended payee defense is based on the fundamental equitable principle that a defendant should obtain relief from liability when no damage has resulted from his wrongdoing. (Citation.)

In addition to the policy against unjust enrichment, the intended payee defense is also grounded on the tort notion of causation. The intended payee defense is available to a bank which has paid a check over the forged endorsement of a payee when the bank's improper payment is not a cause of the drawer's injury flowing from the transaction. This causation aspect envisions occasions in which the drawer is damaged in a forged check transaction but the forgery in noway precipitated or caused the damage. *See, e.g., Modern Equip. Corp. v. Northern Trust Co.*, 284 Ill.App. 586, 1 N.E.2d 105 (1936).

The court concluded that a bank establishes the "intended payee" defense when it proves the following elements:

(1) The proceeds of the check reached the person intended by the drawer to receive them; AND

(2) The drawer has suffered no loss or adverse effect on its rights in the transaction that was proximately caused by the bank's improper payment.

The court stated that the lack of proximate cause could be established by a showing that the bank's improper payment carried out (or did not foil the accomplishment of) the drawer's purpose with regard to the check.

In *Sanwa v. Continental Illinois Nat. Bank*, 247 Ill.App.3d 155, 187 Ill.Dec. 45, 617 N.E.2d 253 (1st Dist.1993), the court sustained the bank's defenses that the drawer would be unjustly enriched by recrediting its account because the funds actually benefitted the intended payee and that the drawer's loss was not the result of the drawee's improper payment. The drawee bank had debited the drawer's account even though only one of the co-payees had not endorsed the checks. Over one year later, after one of the payees filed bankruptcy, the drawer demanded that its account be recredited. The court held that the drawee's evidence conclusively demonstrated that the drawer's losses were caused by the co-payee's insolvency and the drawer's own lax business practices.

Reversing the district court's grant of summary judgment in favor of an erroneously added payee against a bank that had paid certain checks on the other payee's endorsement alone, the Seventh Circuit Court of

Appeals in *Midwest Industrial Funding v. First National Bank of Lockport*, 973 F.2d 534 (7th Cir.1992), remanded the case in order for the bank to present evidence on the common law defense of unjust enrichment. Citing *Douglass v. Wones*, 120 Ill.App.3d 36, 76 Ill.Dec. 114, 458 N.E.2d 514, 521 (2d Dist. 1983), the court noted that a party may recover on an unjust enrichment claim if it proves "an unjust retention of a benefit, including money, by one party to the detriment of another party, against the fundamental principles of justice, equity and good conscience."

■ While the BANKS did not raise the "intended payee" defense in so many words, they allude to facts which infer that it is a defense being raised. Kevin Martin did not divert the funds for his personal gain. Rather, when it appeared that Rumbold Valley Farms either would not accept the check or participate in Kevin Martin's purported scheme to substitute an unrelated-entity receivable, he forged the endorsement on the check, endorsing it over to MFP, thereby bypassing Rumbold Valley Farms and directly depositing the check into the account of MFP, where he intended the check proceeds to ultimately go if Rumbold Valley Farms had not balked at participating in the purported scheme.

■ There are two other questions of fact which prevent summary judgment on the ultimate issue of whether the BANKS are liable on the check. After MFP received the proceeds from the check, repayments were made by MFP to OMI. The BANKS contend these monies should be credited to the forged check. The Trustee contends they should not.

■ The other question of fact involves the Trustee's theory that the CHILLICOTHE BANK was required to have a "large check" policy in place to discover forgeries. The CHILLICOTHE BANK contends it raises a question of fact. Such a contention is based on a negligence concept, which in turn involves a question of fact.

■ The last issue which this Court will address is, assuming the CHILLICOTHE BANK is liable, whether the Trust-

ee may bring a direct action against the CHILLICOTHE BANK. The CHILLICOTHE BANK relies on *Steinroe Income Trust v. Continental Bank N.A.*, 238 Ill. App.3d 660, 179 Ill.Dec. 671, 606 N.E.2d 503 (1st Dist.1992), wherein the court held that the drawer did not have standing to bring a direct action against the collecting bank to enforce the presentment warranties under §§ 3–417(1)(a) and 4–207(1)(a) of the UCC. 810 ILCS 5/3–417(a)(1) and 4–207(1)(a). In so holding, the court stated:

Steinroe filed suit to enforce the presentment warranties under §§ 3–417(1)(a) and 4–207(1)(a) of the Illinois Uniform Commercial Code which provided:

"3–417. Warranties on Presentment and Transfer.

"(1) Any person who obtains payment or acceptance and any prior transferor warrants to a person who in good faith pays or accepts that

"(a) he had good title to the instrument or is authorized to obtain payment or acceptance on behalf of one who has a good title;

. . . .

4–207. Warranties of Customer and Collecting Bank on Transfer or Presentment of Items; Time for Claims.

(1) Each customer or collecting bank who obtains payment or acceptance of an item and each prior customer and collecting bank warrants to the payor bank or other payor who in good faith pays or accepts the item that

(a) he has a good title to the item or is authorized to obtain payment or acceptance on behalf of one who has a good title." (Ill.Rev.Stat.1989, ch. 26, pars. 3–417(1)(a), 4–207(1)(a).)

According to the express language of the sections, a party had standing to enforce the presentment warranties only if it could be deemed the "payor bank" or "other payor" who pays or accepts. We now consider whether Steinroe, as the drawer of the redemption check, had standing to enforce the presentment warranties.

It is clear that Steinroe did not have standing as a "payor bank." The State

Street Bank, not Steinroe, was the "payor bank" on the redemption check.

However, at the time of the proceedings below, it was somewhat unclear whether Steinroe, as the drawer of the redemption check, could be deemed an "other payor" and thereby satisfy the standing requirements. In fact, the parties set forth case law from across the country which presented a majority and minority view on this question. The majority view provided that the language "other payor" required a narrow construction which excluded the drawer of a check. Continental Bank argued that the court should apply this majority view and cited in support thereof, *Oak Park Currency Exchange, Inc. v. Maropoulos* (1977), 48 Ill.App.3d 437, 6 Ill.Dec. 525, 363 N.E.2d 54. The minority view provided that the language "other payor" required a broad construction which included the drawer of a check. Steinroe argued that the court should apply this minority view and cited the leading case in support thereof, *Sun 'n Sand, Inc. v. United California Bank* (1978), 21 Cal.3d 671, 148 Cal.Rptr. 329, 582 P.2d 920.

We note that, after the parties filed their briefs, §§ 3–417 and 4–207 were amended (P.A. 87–582, § 1, eff. Jan. 1, 1992). The Comments to the amended § 3–417 addressed the question concerning application of the majority and minority view:

"In *Sun 'n Sand, Inc. v. United California Bank* [citation], the court held that under former section 3–417(1) a warranty was made to the drawer of a check when the check was presented to the drawee for payment. The result in that case is rejected." (Ill.Ann.Stat., ch 26, par. 3–417, Uniform Commercial Code Comment, at 121 (Smith–Hurd 1992).)

Therefore, we also reject Steinroe's argument for application of the minority view as represented by *Sun 'n Sand.* We hold that Steinroe, as the drawer of the redemption check, did not have standing to enforce the presentment warranties under either the former or amended §§ 3–417 and 4–207.

In *Great Lakes Higher Education Corp. v. Austin Bank of Chicago*, 837 F.Supp. 892 (N.D.Ill.1993), the court followed *Steinroe, supra*, and in dismissing the action brought by the drawer of the check and the drawee bank against the collecting bank for conversion under § 3–419 and revised § 3–420 of the UCC, distinguished *Justus Co., Inc. v. Gary Wheaton Bank*, 509 F.Supp. 103 (N.D.Ill.1981), stating:

Illinois courts do recognize a cause of action for conversion of commercial paper, such as a check, on the theory that the intangible right is merged into the specific document. *Id.* A party pleading an action in conversion under either common law principles or UCC § 3–419 must allege that it had title to or possession of the check. *In re Oxford*, 444 F.Supp. [399] at 404–05 [ (D.C.Ill.1978) ]. Under Illinois law, the elements of a cause of action for conversion under UCC § 3–419 are: (1) plaintiff's ownership of, interest in, or possession of the check; (2) plaintiff's forged or unauthorized endorsement on the check; and (3) defendant bank's unauthorized cashing of the check. *Burks Drywall Inc. v. Washington Bank & Trust Co.* [110 Ill.App.3d 569, 66 Ill.Dec. 222, 226], 442 N.E.2d 648, 652 (Ill.App.Ct.1982).

Austin makes two assertions in order to dismiss First Wisconsin's conversion claim. First it contends that because the checks represent a debt of First Wisconsin rather than an asset, First Wisconsin could not have had the requisite possession or interest in them to claim conversion. We hold that First Wisconsin's only interest in the checks at the time of the alleged wrongdoing was an obligation or debt to the payees, so that First Wisconsin did not have the requisite *possessory* interest to claim conversion. *Id.* The payees were the only ones who had the requisite possessory interest in the checks to bring a claim of conversion. *See* J. White & R. Summers, *Uniform Commercial Code* § 15–5, at 665 (3rd ed. 1988).

First Wisconsin's reliance on *Justus Co. v. Gary Wheaton Bank*, 509 F.Supp. 103, 106 (N.D.Ill.1981), is misplaced because it dealt only with the drawer's rights in conversion rather than the drawee's rights and was decided before the new § 3–420

was released. The Official Comment to § 3–420 rejected Justus's reasoning that a drawer is entitled to sue the depositary bank for conversion by stating that the "check represents an obligation of the drawer rather than property of the drawer" so that there "is no reason why a drawer should have an action in conversion." 810 ILCS 5/3–420, Official Comment 1. The new version of the Code thus supports Austin's contention that a drawee, like a drawer, has no valuable possessory interest in the checks and may not bring a claim for conversion.

The Trustee alleges that the CHILLICOTHE BANK is liable for paying on a forged endorsement without specifying a legal theory, i.e. conversion or breach of warranty of presentment. He seemingly concedes that while the initial liability is that of the PRINCEVILLE BANK, it may ultimately be passed on to the CHILLICOTHE BANK. For the reasons stated by the courts in *Steinroe, supra,* this Court finds that the Trustee may not bring a direct action against the CHILLICOTHE BANK for breach of the presentment warranties. Nor, for the reasons expanded upon earlier in this opinion, may he bring an action for conversion.

 One of the prime objectives of the UCC is settlement in one lawsuit of all aspects of a controversy involving commercial paper. Section 3–803 of the UCC 810 ILCS 5/3–803, (repealed by P.A. 87–582, § 2, eff. Jan. 1, 1992) provided:

Where a defendant is sued for breach of an obligation for which a third person is answerable over under this Article he may give the third person written notice of the litigation, and the person notified may then give similar notice to any other person who is answerable over to him under this Article. If the notice states that the person notified may come in and defend and that if the person notified does not do so he will in any action against him by the person giving the notice be bound by any determination of fact common to the two litigants, then unless after seasonable receipt of the notice the person notified does come in and defend he is so bound.

Under § 3–803 a payor bank which is being sued for payment of a check under a forged endorsement may "vouch in" a collecting bank and tender the defense of the action to the collecting bank. *See Bailey & Hagerdorn, Brady on Bank Checks,* ¶ 29.22, pp. 29–50–29–51 (7th ed. 1992).

A similar provision is now found in § 3–119 of the UCC. It provides:

§ 3–119. Notice of right to defend action. In an action for breach of an obligation for which a third person is answerable over pursuant to this Article or Article 4, the defendant may give the third person written notice of the litigation, and the person notified may then give similar notice to any other person who is answerable over. If the notice states (i) that the person notified may come in and defend and (ii) that failure to do so will bind the person notified in an action later brought by the person giving the notice as to any determination of fact common to the 2 litigations, the person notified is so bound unless after seasonable receipt of the notice the person notified does come in and defend.

810 ILCS 5/3–119.

 This Court has no authority to order the PRINCEVILLE BANK to vouch in the CHILLICOTHE BANK. Unless the CHILLICOTHE BANK voluntarily takes that action, the issue will have to be decided between the Trustee and the PRINCEVILLE BANK with any resolution of the matter between the two banks, if necessary, being left to another action.

This Opinion is to serve as Findings of Fact and Conclusions of Law pursuant to Rule 7052 of the Rules of Bankruptcy Procedure.

See written Order.

### ORDER

For the reasons set forth in the Opinion entered this day, IT IS HEREBY ORDERED that

1. The motion for summary judgment filed by the PRINCEVILLE STATE BANK is hereby DENIED;

2. The PRINCEVILLE STATE BANK shall have twenty-one (21) days from the date of this Order within which to vouch in the FIRST NATIONAL BANK OF CHILLICOTHE. If the PRINCEVILLE STATE BANK fails to do so within the allowed time, the motion for summary judgment filed by the FIRST NATIONAL BANK OF CHILLICOTHE will be allowed by separate order. If the PRINCEVILLE STATE BANK vouches in the FIRST NATIONAL BANK OF CHILLICOTHE, the motion for summary judgment filed by the FIRST NATIONAL BANK OF CHILLICOTHE will be denied by separate order.